Commonwealth of Pennsylvania, Insurance Department and Herbert S. Denenberg, Insurance Commissioner, Petitioners, *v.* Safeguard Mutual Insurance Company, Respondent.

196

Argued October 8, 1974, before President Judge Bow-
MAN and Judges CRUMLISH, JR., WILKINSON, JR.,

MENCER, ROGERS and BLATT. Judge KRAMER did not participate.

*Barton Isenberg,* General Counsel, with him *James D. Keeney,* Assistant Attorney General, and *Israel Packel,* Attorney General, for petitioners.

*Malcolm H. Waldron, Jr.,* for respondent.

OPINION BY PRESIDENT JUDGE BOWMAN, March 31, 1975:

The prolonged and bitter conflict between the Pennsylvania Department of Insurance (Department) and Safeguard Mutual Insurance Company (Safeguard) has reached its Armageddon. While the appropriateness of such a characterization may be questioned, particularly where the field of battle is a courtroom, the postures of the respective parties must be perceived in terms of a "life or death" confrontation. At stake here is whether Safeguard may continue to exist as a privately owned and operated business or whether it is destined to become a "ward of the state."

Safeguard was organized as a domestic mutual fire insurance company in 1938. Prior to 1967, Safeguard's history had been relatively uneventful. For the past eight years, however, the company has more than atoned for the ennui of its early life. Since its 29th birthday, Safeguard has been suspended, reinstated and suspended once

again. This period has also witnessed a change in the nature (from nonassessable to assessable) of the policies the company is permitted to write and an almost uninterrupted series of disputes and negotiations with the Department. The presence of the parties before this Court more than adequately reflects the degree of conciliation and compromise attained through these negotiations.

The event which precipitated this most recent dispute between the parties was the filing of Safeguard's June 20, 1973, quarterly statement with the Department. Sensing that Safeguard's presentation of its financial condition fell somewhat short of strict adherence to the law and to conservative accounting principles, the Insurance Commissioner ordered the performance of a field audit of this statement and a complete examination of the affairs and condition of Safeguard for the period October 1, 1970 through June 30, 1973.[1] This examination was conducted on Safeguard's premises from September 11 to October 29, 1973. As a result of the examination, a report was prepared which concluded that Safeguard was insolvent as of June 30, 1973. At this time, the Commissioner could rightfully have chosen to suspend Safeguard from any further conduct of its business pursuant to section 502 of the Insurance Department Act, 40 P. S. §202. Instead, a formal departmental hearing was held, commencing on January 25 and concluding on January 31, 1974.[2] Although the primary questions raised at the hearing related to Safeguard's financial condition on June 30, 1973,

---

1. The authority for this action is founded in section 213 of The Insurance Department Act of one thousand nine hundred and twenty-one, Act of May 17, 1921, P.L. 789, *as amended*, 40 P. S. §51.

2. It is not clear from the record whether this hearing was requested by Safeguard, as was its right under 40 P. S. §51, or whether it was called by the Department on its own initiative, a procedure which lacks any apparent legal authority.

both sides, and, in particular, Safeguard, presented evidence relevant to a possible change in such condition subsequent to that date. Thereafter, on February 22, 1974, the Commissioner issued an adjudication, finding Safeguard to be insolvent and/or in hazardous condition, and suspending the entire business of the company.

After further and fruitless negotiation, the Commissioner, on March 19, 1974, applied to this Court for an order directing Safeguard to show cause why its business should not be closed and the Commissioner should not take possession of its property and conduct its business.[3] The rule to show cause was granted on March 22, 1974. An evidentiary hearing was held in this Court during May and July of 1974. At the close of the Department's case, Safeguard moved for a compulsory nonsuit, which motion was denied by an Order dated June 13, 1974.

Although proceedings under section 502 of the Insurance Department Act are in the nature of a statutory equity action, arguments on the merits were heard by the Court en banc.[4] This "shortcut" was followed in order to expedite the attainment of a final resolution of the very complex issues here involved, while, at the same time, giving full consideration to the dictates of justice and fairness.

The fundamental questions to which we must respond are whether Safeguard was insolvent and/or in hazardous condition on June 30, 1973, and, if so, whether there was an improvement in Safeguard's financial condition subsequent to that date. However, before undertaking consideration of these substantive issues, the respective

---

3. Section 502 of the Insurance Department Act, 40 P. S. §202.

4. In traditional equity proceedings, oral arguments are initially heard by the Chancellor. Either party then has the option of excepting to the Chancellor's decision, and having a review of those exceptions by the full court.

roles of the parties must be clearly understood. The Department's decision to suspend Safeguard was based upon the examination conducted in the fall of 1973 and, ultimately, upon the company's status as of June 30, 1973. The Department being the moving party, we believe that it bears the burden of proving Safeguard to be insolvent and/or in hazardous condition on that date. Should the Department thus persuade this Court that Safeguard was insolvent and/or in hazardous condition on June 30, 1973, the onus would then fall upon Safeguard to show a subsequent change in its condition, which change resurrected the company.

## I. INSOLVENT/HAZARDOUS CONDITION

Section 502 of the Insurance Department Act, 40 P.S. §202, authorizes the Commissioner to suspend the entire business of an insurance company should an examination reveal the company to be "insolvent" or "in such condition that its further transaction of business will be hazardous to its policyholders, or to its creditors, or to the public."[5] Neither the Pennsylvania insurance laws nor the case law interpreting them provide a definition of "insolvent" or of "hazardous condition" as those terms are used in section 502. While several Pennsylvania statutes contain definitions of "insolvent" in a noninsurance context, the most comprehensive and practical definition, for insurance company purposes, appears in section 1-201(23) of the Uniform Commercial Code.[6] That section reads:

"(23) A person is 'insolvent' who either has ceased to pay his debts in the ordinary course of business or cannot pay his debts as they become due or

---

5. Section 502 lists other grounds for suspension, but none of those have been raised here.

6. Act of April 6, 1953, P. L. 3, *as amended*, 12A P. S. §1-201 (23).

is insolvent within the meaning of the federal bankruptcy law."

The federal law defines "insolvent" as follows:

"(19) A person shall be deemed insolvent within the provisions of this title whenever the aggregate of his property . . . shall not at a fair valuation be sufficient in amount to pay his debts";[7]

The actual test of insolvency under the federal law is a simple balance sheet test; that is, where, at a fair valuation, a person's assets exceed his liabilities, that person is solvent. *Ackman v. Walter E. Heller & Co.,* 307 F. Supp. 958 (S.D.N.Y. 1968), *motion denied,* 307 F. Supp. 971, *aff'd,* 420 F.2d 1380 (2d Cir. 1969).

From the above, it is possible to formulate a hybrid definition of "insolvent," applicable to Pennsylvania insurance companies. An insurance company is "insolvent" under section 502 of the Insurance Department Act when either it has ceased to pay its debts, in particular, claims, in the ordinary course of business, or it cannot pay its debts, in particular, claims, as they become due, or, taken at a fair valuation, its assets are lesser in amount than its liabilities.

Since the Department has neither alleged nor attempted to prove a nonpayment of debts or an inability to pay debts on the part of Safeguard, the decision regarding insolvency in this case will rest upon a comparison of Safeguard's assets and liabilities.

The term "in hazardous condition" is less receptive to guidance in framing a definition. Cases from other jurisdictions suggest that "hazardous condition" is not limited to financial considerations, and includes such matters as mismanagement, fraud, and public policy. However, for the purposes of this case, where the only allegations are directed to the financial condition of Safeguard, "hazardous condition" may best be defined as

---

7. 11 U.S.C.A. §1(19).

imminent insolvency, a state in which there is a dwindling surplus and a substantial likelihood, based on recent trends within the company, that a condition of actual insolvency will be reached in the near future.

While Safeguard's June 30, 1973 quarterly report indicated an excess of assets over liabilities (surplus) of about two million dollars, the Department, based upon its examination, found a *negative* surplus of at least $500,000 on that date. This discrepancy primarily resulted from the Department's refusal to consider certain items as assets, and its conclusion that Safeguard's reserves were understated. During the remainder of this opinion, each of these accounts, and the legal principles pertinent thereto, will be separately analyzed.

## II. UNEARNED PREMIUM RESERVE

When an insurance company writes a policy and collects the premium thereon prior to the expiration of the term of the policy, a pro rata portion of the premium is considered unearned. By way of illustration, if an insurance company collects a $60 premium on a six month policy, after the first month of the term has elapsed, $10 is earned premium and $50 is unearned and will become earned only as the remainder of the policy term expires. At any point in time, the total amount of unearned premiums on all policies written by an insurance company constitutes that company's unearned premium reserve. As are most reserves, the unearned premium reserve is a contingency fund. The contingency for which it exists is that some or all of the policies may be cancelled (by the insurer or the insured) prior to the expiration of their terms. When such a cancellation occurs, the company is responsible for the return of the unearned portion of the premium to the insured, and the existence of an unearned premium reserve guarantees the availability of funds for that purpose.

Of course, the unearned premium reserve is merely an accounting concept unless its maintenance is statutorily imposed upon an insurance company. Section 310 of the Insurance Department Act, 40 P. S. §91, is the primary statutory provision relating to the unearned premium reserve. That section authorizes the Commissioner to determine the amount "any insurance company . . . should hold as an unearned premium liability."[8]

Because it refers to "any insurance company," section 310 would have clearly obligated Safeguard to maintain an unearned premium reserve, unless Safeguard was otherwise excepted from its application. Safeguard is a domestic mutual fire insurance company which issues assessable policies. Section 807 of The Insurance Company Law of 1921,[9] 40 P. S. §917, contains an important exception, which eliminates the unearned premium reserve requirement of certain of such companies.

"*Except when cash premiums are payable in advance,* the provisions relating to unearned premium reserve shall not apply to policies issued by a domestic mutual fire insurance company which policies set forth therein, or in the promissory note attached thereto, a limited or unlimited liability to assessment." (Emphasis added.)

In terms of the amount of funds in dispute, the unearned premium reserve is the single most important issue raised by this litigation, and its resolution is wholly dependent upon the interpretation given the phrase "cash premiums payable in advance." That phrase lends itself to two possible interpretations:

1. Cash premiums are payable in advance when the insurance contract permits the insurer to demand all or part of the premium prior to the provision of

---

8. The terms "reserve" and "liability" are interchanged throughout the Pennsylvania insurance law. Therefore, no significance should be attached to the use of one in lieu of the other.

9. Act of May 17, 1921, P. L. 682, *as amended.*

*any* coverage to the insured. The premium is payable before the policy term begins to run.

2. Cash premiums are payable in advance when the insurance contract permits the insurer to demand all or part of the premium prior to the provision of *full* coverage to the insured. The premium is payable before the policy term completely elapses.

The second postured interpretation is the far more restrictive of the two, limiting the scope of benefit of the section 807 exception only to those insurance companies which issue a policy, provide coverage for the full term of the policy, and then, and only then, become entitled to the receipt of any of the premium on the policy. It is this very restrictiveness which militates against its adoption. As can be seen upon closer scrutiny, the companies which could qualify under the section 807 exception, if the second interpretation were adopted, are companies which need not rely upon that exception to avoid the unearned premium reserve requirement. Since the full premiums on policies issued by such companies would be earned immediately upon collection, there would be no basis upon which to compute an unearned premium reserve under section 310.[10]

Section 310 contains various and alternate methods of calculating the unearned premium reserve. In actual practice, the method employed is to compute the amount of the reserve on the basis of the unearned portions of the gross premiums charged. Under the second interpretation, the companies which qualify for the section 807 exception would never possess such "unearned portions." As to those companies, the section 807 exception would be mere surplusage, bestowing an unneeded benefit. An

---

10. Referring to the earlier illustration, if the premium was $60, the term of coverage was six months, and the premium was not collectible, in whole or part, until after the expiration of the six months, the entire $60 would be earned immediately upon receipt by the company.

adoption of this second interpretation would render the section 807 exception meaningless, a result which this, or any, Court is expressly forbidden to foster. "The Legislature cannot be deemed to intend that its language be superfluous and without import." *Daly v. Hemphill,* 411 Pa. 263, 273, 191 A.2d 835, 842 (1963). Thus, to give meaning to this language, we must adopt the first postured interpretation. Therefore, "cash premiums are payable in advance," within the meaning of section 807 of the Insurance Company Law, when, and only when, the insurance contract permits the insurer to demand all or part of the premium prior to the commencement of the policy term. In all other cases, the insurer, if a domestic mutual fire insurance company issuing assessable policies, will not be bound by the provisions relating to unearned premium reserve and, in particular, section 310. The only pertinent evidence introduced at the hearing clearly established that premiums were not payable in advance to Safeguard under its contracts of insurance. Safeguard thus qualified under the exception contained in section 807 and need not have maintained an unearned premium reserve on June 30, 1973.

For the purpose of giving this issue as complete a disposition as possible, we feel compelled to consider other arguments raised by the Department relating to the maintenance of an unearned premium reserve. The Department, perhaps reluctant to place its sole reliance upon the general mandate of section 310, has also cited section 202 (f) of the Insurance Company Law[11] as authority for the imposition of this reserve requirement upon Safeguard. That section provides:

"(f) Domestic stock and mutual insurance companies . . . may transact any or all of the kinds of insurance included in subdivisions (b) and (c) of this section *upon compliance with all of the financial*

---

11.   40 P. S. §382 (f).

*and other requirements* prescribed by the laws of this Commonwealth for fire, marine, fire and marine, and casualty insurance companies transacting such kinds of insurance." (Emphasis added.)

As of June 30, 1973, Safeguard was transacting certain types of insurance which are among those enumerated in sections 202(b) and (c), namely, automobile liability, comprehensive and collision. Having taken advantage of section 202(f), Safeguard was bound to comply with the "financial and other requirements" directed by that section. The Department has advocated the inclusion of the unearned premium reserve as an element of the ambiguous phrase "financial and other requirements." Despite section 807's specific exemption of certain domestic mutual fire insurance companies, the Department has apparently contended that section 202(f) preempts section 807 and revitalizes the applicability of section 310. Two Pennsylvania decisions belie the validity of this contention. Although neither decision offers a clue as to the exact scope of section 202(f), both impliedly exclude the unearned premium reserve from the "financial and other requirements" imposed thereby. In *Bunker Hill Mutual Insurance Co. v. Leslie*, 382 Pa. 356, 115 A.2d 378 (1955) and *Commonwealth ex rel. Chidsey v. Urban Mutual First Insurance Co.*, 72 Pa. D. & C. 123 (1950), the matter before the courts was the unearned premium reserve requirement of a domestic mutual fire insurance company. Opposite results were reached, based upon the applicability of the section 807 exception. However, the significance of the two decisions lies in both courts' failure to cite section 202(f) as relevant in determining whether a particular domestic mutual fire insurance company was subject to the reserve requirement of section 310. Section 807 was viewed as the fulcrum upon which the resolution of the issue would turn. By ignoring section 202(f), the courts impliedly limited its scope to "financial and other requirements" apart from the unearned premium reserve.

The Department's final salvo was also its weakest. Section 316 of the Insurance Department Act, 40 P. S. §115, vests in the Commissioner the discretionary power to require the maintenance of additional reserves by an insurance company. Since section 316 refers solely to "liability or compensation loss reserves," it is manifestly inappropriate in the context of unearned premium reserves.

To summarize, sections 310 and 807 are the only statutory provisions relevant to a resolution of this issue. Section 310 requires every insurance company to maintain an unearned premium reserve. Section 807 contains a narrow exception to section 310, and Safeguard qualifies under that exception. Therefore, in our determination of whether Safeguard was insolvent and/or in hazardous condition on June 30, 1973, Safeguard will be considered as having had no liability for an unearned premium reserve.

III. UNEARNED BROKERS' COMMISSIONS

On its June 30, 1973, quarterly, Safeguard reported its liability for unearned premium reserve as $988,884.88. In the examination report which contained the initial finding of insolvency, the Department assessed this same liability at $1,519,590.51. The parties have agreed that the total amount of Safeguard's unearned premiums on June 30, 1973, was equal to the higher figure. The discrepancy in evaluating the unearned premium reserve liability resulted from Safeguard's establishment of a contra liability in reduction of its full statutory liability. This contra liability had as its basis the so-called "unearned commissions" of Safeguard's brokers. Although no longer relevant to a disposition of this case, the validity of this setoff procedure should be determined.

Safeguard has postulated that the commission received by a broker upon his writing of a policy must be prorated over the life of the policy in the same way that

premiums collected by the insurer are prorated.[12] Further, Safeguard has contended that, upon premature cancellation of a policy, the broker is legally obligated to return the unearned portion of his commission to the insurer, who then remits the full amount of the unearned premium (including the broker's share) to the insured. Under this theory, the "unearned brokers' commissions" would serve to reduce the potential liability of the insurer when cancellations occur. Although Safeguard failed to offer support for this theory, it is the opinion of this Court that a pro rata portion of the commissions received by an insurance company's brokers may be established as a contra liability to the company's unearned premium reserve, *if* the brokers are contractually bound, upon the cancellation of a policy, to make repayment to the company.

As a general rule, an insurance broker's commission is fully earned immediately upon the writing of the policy. *Schlesinger v. Star Ins. Co. of America,* 100 Pa. Superior Ct. 584 (1931). In addition, the broker's right to the entire commission is unaffected by a premature cancellation of the policy. *Id.* However, the broker is free to contractually waive this right. *Id.* In *Hammonton Investment & Mortgage Co. v. Empire Mutual Fire Insurance Co. of Pennsylvania,* 387 Pa. 382, 128 A.2d 73 (1956), the court found such a waiver where the broker agreed, pursuant to a clause in his contract, to repay his commissions pro rata in cases of cancellations. Also, the *Hammonton* court held that the broker's duty to return his commission to the company arose concurrently with the company's duty to return its unearned premium to the cancelling policyholder. The act of cancellation simultaneously triggered both duties. Thus, when properly contracted for, the right of the company to the "unearned brokers' commissions"

---

12. Safeguard's position is illustrated as follows: if a broker receives a $50 commission on a six month policy, only $25 is earned after the first three months elapse.

is no more contingent than the duty of the company to remit the unearned premium, and this right may be correctly set off against the company's unearned premium reserve liability.

Had an application of these principles been essential to this decision, Safeguard's treatment of the "unearned brokers' commissions" as a contra liability would have been invalidated. While Safeguard did introduce evidence that its brokers customarily remitted portions of their commissions to the company when cancellations occurred, such evidence did not sufficiently establish a contractual obligation to so remit.

## IV. LIABILITY LOSS RESERVES

The Department carefully qualified its initial conclusion that Safeguard's negative surplus on June 30, 1973, fell somewhere between $500,000 and $600,000. These figures were viewed as extremely conservative since they did not include any additional liability Safeguard may have had under section 313 of the Insurance Department Act, 40 P. S. §112.

Basically, section 313 requires stock and mutual casualty companies to maintain a reserve for outstanding losses under liability policies written by such companies. By outstanding losses is meant all incurred and unpaid losses, regardless of whether they have actually been reported to the company. This reserve is also intended to anticipate the payment of expenses which arise incident to such losses. Section 313's reference to "stock and mutual *casualty*" companies does not thereby excuse all other types of insurance companies from compliance with its provisions. In particular, other mutuals may be treated as casualty companies, for purposes of section 313, depending on the kinds of insurance coverages they furnish.

"A mutual insurance company, other than a mutual life company, shall maintain unearned premium

and other reserves separately, for each kind of insurance, upon the same basis as that required of domestic stock insurance companies transacting the same kind of insurance . . . ."[13]

When a mutual company, not chartered as a casualty company, engages in the sale of policies properly characterized as casualty coverage, that company assumes the same reserve obligations as are specifically imposed upon a casualty company. Among the enumerated coverages that a casualty company may provide is automobile liability insurance.[14] Since Safeguard also furnished automobile liability coverage, Safeguard should have been perceived in the same light as a stock casualty company insofar as the maintenance of reserves is concerned. While, pursuant to section 807, a domestic mutual fire insurance company may be exempted from the unearned premium reserve requirement, no such exemption applies to liability loss reserves. Therefore, and despite its designation as a domestic mutual fire insurance company, Safeguard was bound, on June 30, 1973, to comply with section 313.

Besides ordering certain companies to maintain a liability loss reserve, section 313 also provides a method for computing such reserve. Companies which are subject to the dictates of section 313 are permitted to estimate the appropriate size of this reserve fund. Such estimates are referred to as "case basis and loss expense reserves," and are founded upon the prior experience of the company. Where the reserve computed under section 313 exceeds the company's own estimate, the difference must be reported on the liability column of the company's balance sheet as the "excess of liability statutory reserves over case basis and loss expense reserves." Hence,

---

13. Section 807 of the Insurance Company Law, 40 P. S. §917.

14. Section 202 (c) (11) of the Insurance Company Law, 40 P. S. §382 (c) (11).

whether the company's estimate is high or low, or even where the company makes no estimate whatsoever, the company's liability under section 313 will be the same.

Safeguard has argued that its "case basis and loss expense reserves," as reported on its June 30, 1973, quarterly, were sufficient in amount to satisfy section 313. The Department has disagreed. During the course of our hearing, the Department's expert introduced computations which, if accurate, revealed Safeguard's estimated reserves to be deficient by about $900,000 on June 30, 1973. Combining this figure with the negative surplus alleged by the Department in its examination report, it has been the Department's position that on June 30, 1973, Safeguard was insolvent by at least $1.4 million.

The section 313 liability loss reserve is computed according to the following formula:

"(b) For all liability policies written during the three years immediately preceding the date as of which the statement is made, such reserve shall be sixty per centum of the earned liability premiums of each of such three years, less all loss and loss expense payments made under liability policies written in the corresponding years . . . ."

In concluding that Safeguard's liability loss reserve was deficient, the Department's expert proceeded under instructions given him by his employer. He never referred to the statutory formula. Presumably, the Department has employed the method of computation contained in its instructions for many years, perhaps since the 1921 enactment of section 313. If it is true that longevity lends credibility, the Department's interpretation of section 313 presents a glaring exception. A step-by-step analysis of the statutorily prescribed formula demonstrates the extent to which the Department has misread section 313:

1. The liability loss reserve is based upon a three year experience. For our immediate purposes, the relevant time extends from July 1, 1970 through June 30, 1973.

2. The "earned liability premium of each of such three years" must be ascertained.[15] In its method of computation, the Department incorrectly measured this earned premium as the sum of the premiums charged on all liability policies written during each period *and the unearned liability premiums from the beginning of each period,* less the unearned liability premiums at the end of each period. Section 312 of the Insurance Department Act[16] mandates the use of a different equation:

> "The term 'earned premiums,' as used in sections 313 to 317 inclusive, shall include gross premiums charged on all policies written . . . less unearned premiums on policies in force. . . ."

This definition ignores the unearned premiums from the beginning of each period, and renders erroneous the Department's inclusion of that figure in its formula.

3. The resulting earned premium figures must then each be reduced to 60% of their full value.

4. Next, the liability loss payments and liability loss expense payments for each period are determined.

5. Finally, the Step #4 figures from each period are combined, and are then deducted from the sum of the Step #3 figures. The result is the amount the company must maintain as a liability loss reserve. This amount is compared to the company's "case basis and loss expense reserves," and, if the latter are deficient, the difference is entered as an additional and distinct liability on the company's financial statements.

---

15. Actually, we are here concerned with four distinct periods within the three year experience, namely, July 1, 1970 through December 31, 1970; January 1, 1971 through December 31, 1971; January 1, 1972 through December 31, 1972; and January 1, 1973 through June 30, 1973.

16. 40 P. S. §111.

The application of the preceding formula to Safeguard's three year experience demanded more than the mere substitution of figures for the corresponding terms. In many instances, estimates had to be made, and, although those estimates were based upon detailed analyses and calculations, the result can best be described as a very close approximation of Safeguard's reserve liability under section 313.[17] Nevertheless, this Court is firmly convinced that, on June 30, 1973, Safeguard's "case basis and loss expense reserves" completely satisfied the requirements of section 313. Therefore, in our determination of whether Safeguard was insolvent and/or in hazardous condition on June 30, 1973, Safeguard will be considered as having had no excess statutory liability under section 313.

Before proceeding to the next issue, the Court must once more consider the applicability of section 316 of the Insurance Department Act, 40 P. S. §115.[18] While section 316 does vest in the Commissioner the discretionary power to require an insurer to maintain additional liability loss reserves, this power is exercisable only upon the satisfaction of a condition precedent: the Commissioner must initially find that the liability loss reserve calculated in accordance with section 313 is "inadequate." No such finding is evidenced by the record. The Department's sole dispute with Safeguard, in the context of the liability loss reserve, lay in the opposing methods of calculation espoused by the parties. The Department has demonstrated a complete satisfaction with the results derived from its erroneous interpretation of section 313, and has made no implications as to their inadequacy. The condition precedent having

17. A presentation of the Court's mathematics herein would probably serve no great purpose, and may, in fact, prove highly confusing.

18. This section was previously analyzed under the "unearned premium reserve" segment of this opinion.

failed, the Department may not attempt a belated exercise of the discretionary power contained in section 316.

## V.   COMMON STOCK

The reserve questions having been resolved, we must now proceed with a disposition of the second major issue raised by this litigation: the propriety or impropriety of the Department's decision to exclude certain of Safeguard's assets from the determination of the company's financial condition. In concluding that Safeguard was insolvent and/or in hazardous condition on June 30, 1973, the Department refused to assign any value to many of the properties owned or otherwise claimed by the company. Those assets deemed valueless have been referred to by the Department as "nonadmitted assets," while all other assets were "admitted." The Department's terminology and its applicability in an insurance company insolvency proceeding are not without precedent. *See National Life Insurance Company of the United States of America v. Haines*, 255 Pa. 599, 100 A. 517 (1917).

Among the assets not admitted by the Department were all of the shares of common stock owned by Safeguard. The Department has contended that Safeguard's ownership of common stock was violative of the statutory provisions restricting the investments of a domestic mutual fire insurance company which issues assessable policies.

Section 802 of the Insurance Company Law, 40 P. S. §912, sets forth the permissible scope of investment of domestic mutual insurance companies:

"(1)   A   domestic   mutual   insurance   company, other than a mutual life insurance company, *that writes assessable policies*, shall invest its assets only in accordance with the laws of this Commonwealth *relating to the investment of the capital of domestic stock insurance companies* authorized to transact the

same class or classes of insurance." (Emphasis added.)

In addition to the preceding, mutual companies writing nonassessable policies may invest any "excessive funds"[19] in accordance with the investment provisions applicable to the surplus of domestic stock companies which transact the same classes of insurance.[20] In order to identify the kinds of stock companies with which Safeguard shared a common ground as to the classes of insurance transacted, we must first determine the composition of Safeguard's business as of June 30, 1973. Safeguard was then writing fire insurance policies, but the greater portion of its business was the furnishing of automobile liability, comprehensive, and collision coverages. Stock companies which may legally transact any one or more of these classes of insurance are fire, marine, fire and marine, and casualty companies.[21] Thus, for investment purposes, Safeguard was subject to the same limitations as the law imposes upon those four kinds of companies. Sections 517 and 518 of the Insurance Company Law[22] enumerates the types of investments allowed stock fire, marine, and fire and marine companies. Section 517 pertains to investments of *capital*, while section 518 treats investments of *surplus*. Almost identical (in language) provisions regulate the capital and surplus investments of stock casualty companies.[23]

As noted earlier in this discussion, section 802, which applies to mutual companies generally, extends greater

19. "Excess funds" are measured by the minimum capital requirements of corresponding stock companies.

20. Section 802(2), 40 P. S. §912(2).

21. Section 202 of the Insurance Company Law, 40 P. S. §382.

22. 40 P. S. §§652, 653.

23. Sections 602 and 603 of the Insurance Company Law, respectively, 40 P. S. §§722, 723.

investment leeway to companies writing nonassessable policies (nonassessable companies) than to those writing assessable policies (assessable companies). The latter are strictly limited to investments contained within the capital investment provisions (sections 517 and 602),[24] while nonassessable companies, under certain circumstances, may properly invest in accordance with the surplus investment provisions (sections 518 and 603). Within this distinction is contained the focal point of the parties' dispute regarding the common stock.

When it acquired the common stock, Safeguard was a nonassessable company. As such, Safeguard was not limited to capital investments, but, in addition, could have correctly invested in accordance with the surplus investment provisions.[25] While, under the surplus provisions, the common stock of a solvent corporation[26] is a permissible investment, the capital investment provisions do not sanction such an investment. Thus, when originally acquired, the common stock was an admitted asset of Safeguard's. What effect, if any, did a subsequent change in

---

24. Safeguard has cited a Department regulation, 31 Pa. Code §101.1, as support for extending the benefits of the surplus investment provisions to domestic mutual fire insurance companies writing assessable policies. While, because of patent ambiguity, that regulation could be so construed, such a construction would effectively invalidate the regulation. Section 802 clearly limits assessable companies to capital investments *only*, and the Department, through its regulatory power, cannot contradict the substance of a properly legislated statutory provision.

25. This assumes, of course, that Safeguard was possessed of the requisite surplus at the time of acquisition of the stock. Since the Department has neither alleged nor proved the contrary, this assumption will be considered as fact.

26. Again, the Department has failed to allege or prove the insolvency of the issuing corporations. Therefore, this Court finds that these corporations were, in fact, solvent on the date of Safeguard's acquisition.

the types of policies Safeguard is authorized to write[27] have upon the status of the common stock as an admitted asset? As of June 30, 1973, did the fact that Safeguard's investments were strictly limited to those contained within the capital investment provisions (sections 517 and 602) result in a change in this status to nonadmitted?

Both sections 517 and 602 are phrased in terms of "capital ... *shall be invested* only as follows ...." (Emphasis added.) The legislature's use of the verb "invested" in lieu of the noun "investment" is strongly indicative of an intent to restrict, not so much the *type of investment,* but rather, the *act of investing.* That is, these sections, and the restrictions contained therein, become operative only upon the actual date of investment when the company actively exchanges some or all of its assets for other properties. Neither section has retroactive application to the prior acquisitions of investments, which acquisitions were then properly authorized under other sections of the law (in this instance, sections 518 and 603). An asset, once properly admitted, does not become nonadmitted simply because a change in the status of the company holding said asset results in greater restrictions on the act of investing. Had the legislature intended the opposite result, sections 517 and 602 would have read "a company *shall hold investments only as follows,*" or similarly.

On its June 30, 1973, quarterly, Safeguard reported its common stock at a value of $67,157.50. The Department neither alleged nor attempted to prove the inaccuracy of this valuation. Therefore, in our determination of whether Safeguard was insolvent and/or in hazardous condition on June 30, 1973, Safeguard will be considered as having had, as an admitted asset, common stock at the full value reported.

---

27. Safeguard became an assessable company in the summer of 1971.

## VI. MÜHLENBERG MORTGAGE

On its June 30, 1973, quarterly, Safeguard reported, as assets, several loans on real estate, one of which was secured by a first mortgage covering 35.3 acres of land in Muhlenberg Township, Berks County. This particular mortgage was valued at $128,000. In concluding that Safeguard was insolvent and/or in hazardous condition on June 30, 1973, the Department adjudged this mortgage to be a nonadmitted asset, citing sections 517 and 602 of the Insurance Company Law[28] as authority for its decision.

Sections 517 and 602 permit an insurance company to invest " (e) [i]n ground-rents and loans upon improved and unencumbered real estate." The Department refused to admit the Muhlenberg mortgage because the real estate did not have a structure erected thereon. The absence of a structure, in the Department's view, rendered the real estate not improved.

While Pennsylvania law (statutes and cases) is replete with definitions of "improved," none of these definitions have been applied in the context of the security for real estate loans advanced by an insurance company. Certainly, any or all of these definitions could be adapted to use in the context of this case. However, this Court favors the formulation of a more precise and suitable definition of "improved real estate."

The investments of insurance companies are closely regulated in order to guarantee the availability of funds for the payments of claims submitted by its policyholders. Although an insurance company, like all businesses, must invest its assets for profit, the law prohibits insurance companies from engaging in essentially speculative investments. In particular, land investment is restricted to loans upon improved real estate. Through this restriction, the legislature attempted to guarantee that, in anticipa-

---

28. 40 P. S. §§652, 722.

tion of possible default in the repayments of real estate loans, the security would be of sufficient worth to prospectively minimize or eliminate the company's and, ultimately, the policyholders' potential for loss. The Department has argued that the requirement of a structure on the real estate is the most effective means to provide this certainty. While the presence or absence of a structure may provide the simplest means to distinguish between improved and unimproved real estate, it is neither the most effective nor the most logical criterion upon which to base this distinction.

Where the real property provided as security for funds loaned by an insurance company is "readily marketable" and has an "ascertainable fair market value," that real property is "improved" under both sections 517 and 602. By "readily marketable" is meant that, in case of default by the mortgagor and foreclosure by the company, the company can anticipate having little or no difficulty in locating a purchaser willing to pay a price sufficient in amount to provide the company with a complete return on its original investment. An "ascertainable fair market value" exists where, at the time of the investment, the real property given as security has a measurable market value, about which experts would not unduly disagree. The presence of both factors guarantees as much as possible, that an insurance company will not transact loans secured by property which is located "in the middle of nowhere," property whose value as adequate security is contingent upon the occurrence of future events. The absence of either factor, at the time of the loan, will render the real estate "not improved" and the mortgage a nonadmitted asset.

Aside from the absence of a structure, the Department offered no evidence as to the condition of the Muhlenberg tract at the time the loan was made. Safeguard's presentation was equally deficient, although the company's evidence did establish a current (as of June 30,

1973) high growth rate within the Muhlenberg community, as well as a current fair market value in excess of $200,000 for the tract. However, the burden having been placed upon the Department to justify its administrative conclusions, Safeguard will not be prejudiced by the inadequacies of its own case. Therefore, in our determination of whether Safeguard was insolvent and/or in hazardous condition on June 30, 1973, Safeguard will be considered as having had, as an asset, a mortgage, secured by the Muhlenberg tract, at a value of $128,000, the full value reported.

## VII. OTHER MORTGAGES

In addition to the Muhlenberg mortgage, Safeguard's June 30, 1973, quarterly reported, among the company's assets, several other loans secured by real estate. Two of these loans were secured by individual residential properties located in Philadelphia, while the third, referred to as a "blanket mortgage," listed three such properties as the security therefor. While the Department conceded that all of these loans were "upon improved . . . real estate,"[29] the Department did not allow Safeguard credit for the full value of the loans. The Department's refusal to permit, as admitted assets, one of the individual mortgages in its entirety and the blanket mortgage in part[30] was based upon the Department's finding that, on June 30, 1973, these mortgages were in default as to principal

---

29. Sections 517 and 602 of the Insurance Company Law, 40 P. S. §§652, 722. Of course, the Department's concession merely referred to the presence of structures on the properties. However, absent proof that the properties were either not readily marketable or did not have an ascertainable fair market value, the properties will be deemed "improved," as this Court has defined that term.

30. One of three properties securing the "blanket mortgage" had been foreclosed and the title to such property was in Safeguard on June 30, 1973. The Department allowed this property as an admitted asset under "real estate owned," at a value of one-third of the total mortgage.

and interest, and that there were tax delinquencies on the properties securing same. The Department did not introduce any evidence regarding either the amounts of the defaults and delinquencies, or their effect upon the values of the mortgages as reported by Safeguard.

The Department's attempt to establish an interdependency between the status of the mortgages as admitted or not admitted, and the existence of defaults in repayments of the loans and prior liens on the properties securing the loans is destined to fail. There exists no correlation between these factors. Although the existence of prior liens and the tenuous position of the loan itself may have substantially affected the valuation of the mortgages, these factors would not have transformed the legal status of the mortgages to nonadmitted. Both sections 517 and 602 restrict the *act of investing*. Once this act has legally occurred, that is, the investment is among those enumerated within the two sections, the asset thereby obtained assumes the status of admitted. Subsequent events may require a devaluation of an admitted asset, but they cannot be deemed so fundamental as to effect a complete metamorphosis of the asset's legal status.

Had the Department directed its proofs to the establishment of a lower value for these mortgages (through evidence illustrating the extents of the defaults and delinquencies), or even a zero value, this Court would have no difficulty in finding Safeguard's book values to be excessive. However, by ignoring valuation and relying instead upon its own inaccurate interpretation of sections 517 and 602, the Department has permitted this Court no option. Therefore, in our determination of whether Safeguard was insolvent and/or in hazardous condition on June 30, 1973, Safeguard will be considered as having had, assets, other mortgages (apart from the Muhlenberg mortgage), at a value of $13,211.47, the full value reported.[31]

---

31. Referring to footnote #30, whether that property is con-

## VIII. 1321 ARCH STREET

Safeguard's main business offices occupy two floors of a multi-story building located at 1321 Arch Street, in Philadelphia. The company's June 30, 1973, quarterly reported this building as an asset having a net value of $682,051.18.[32] The building was designated a nonadmitted asset by the Department, due to the want of record title in Safeguard. Although the most recent deed within the chain of title did not identify Safeguard as the grantee, the company has adhered to its claim of ownership.

By deed dated March 13, 1972, fee simple title to the building was conveyed by one, Josephine Y. Buccino, to the C. M. Clark Insurance Agency, Inc. (Clark), a company having close familial ties to Safeguard. This conveyance vivified the terms of an agreement which had been previously executed between Safeguard and Clark. Through this agreement, and in anticipation of the conveyance, Clark consented to allow Safeguard to consider itself the owner of the building. It is upon the efficacy of this agreement that Safeguard has based its entitlement to report the building as its asset.

The Department's decision to deny Safeguard the value of the building evolved from the admitted/nonadmitted dichotomy. However, the Department's designation of the building as a "nonadmitted asset" was an unmerited concession. Safeguard was not the record owner of the building. In the context of an insolvency proceeding, where the nature of property as an asset of a par-

---

sidered a mortgage or real estate owned will not affect its ultimate valuation. Therefore, the $13,211.47 does include the value of that property, despite the fact that its value could have been more properly reported as a fee simple.

32. This "net value" includes adjustments for depreciation and encumbrances. Safeguard alleged the fair market value of the building to be $1.2 million.

ticular company is determined by the availability of the property for the payment of that company's debts,[33] the building was not an asset, admitted or otherwise, of Safeguard's. Whatever rights became vested in Safeguard through its agreement with Clark, none would have satisfied a potential purchaser that Safeguard had the power, on June 30, 1973, to convey legal title to the building.

A valuation question arose in conjunction with the ownership issue. It has been the Department's policy to require insurance companies to report their real estate holdings on a cost basis rather than a market value basis. This policy is reflected by an instruction appearing on the annual statement forms supplied by the Department to insurance companies within its domain. There exists no apparent statutory or regulatory authority for this requirement. Albeit conservative accounting principles prefer the reporting of assets at the lower of cost or market, there is no legal bar to the revaluation of an asset to its higher market value for the purpose of presenting a stronger, though accurate, financial picture. Therefore, had Safeguard been justified in reporting the Arch Street building as one of its assets, it could properly have done so at a provable fair market value.

Therefore, in our determination of whether Safeguard was insolvent and/or in hazardous condition on June 30, 1973, Safeguard will be considered as having had no valuable interest in the building located at 1321 Arch Street.

## IX. CLARK DEBENTURE

Safeguard's June 30, 1973 quarterly revealed, among the company's assets, bonds having a value of $1.43 million. As a consequence of its examination in the fall of

---

33. *American National Bank &Trust Co. of Chicago, Ill. v. Bone*, 333 F.2d 984 (8th Cir. 1964).

1973, the Department decreased this value to $1.18 million. The greater part of this diminution resulted from the Department's refusal to allow as an admitted asset the so-called Clark Debenture, which was reported by Safeguard to be worth about $220,000 on June 30, 1973.[34]

The Department has offered three distinct reasons in support of its decision to exclude the Clark Debenture:

1. The Debenture was not a legally authorized investment of a domestic mutual fire insurance company which issues assessable policies;

2. The Debenture was not an "amply secured" evidence of debt;[35] and

3. The Debenture had never been submitted for valuation to the Subcommittee on Securities Valuation of the National Association of Insurance Commissioners (NAIC).

The Department's conclusion that the Clark Debenture represented an illegal investment was founded in the Department's analysis of Safeguard's permissible scope of investment. Sections 517 and 602 of the Insurance Company Law enumerate the types of investments permitted a domestic mutual fire insurance company which issues assessable policies and which writes casualty business. Since neither section allows an insurance company to invest in evidences of indebtedness issued by a nongovernmental entity, the Department concluded that the Clark Debenture was an illegal investment and, therefore, a nonadmitted asset. This conclusion necessarily emanated from two presumptions, namely, that the in-

---

34. Approximately $30,000 was deducted from the reported value of the bonds because of Safeguard's alleged error in reporting treasury bonds, which had been purchased at a discount, at their par values. Safeguard has not questioned the legitimacy of that particular conclusion of the Department's.

35. Section 1 of the Act of July 12, 1935, P. L. 969, *as amended*, 40 P. S. §405a.

vestment provisions were appliacble to the acquisition of the Clark Debenture, and that sections 517 and 602 were the only such provisions so applicable.

This Court views the first of these presumptions as unsupportable. When issued in 1970, at a face value of $340,000, the Debenture manifested an attempt by Clark to restore Safeguard to its former and more robust financial position. Two unrelated "transactions," both of which had occurred well in advance of the date of the Debenture's issuance, and neither of which had created an indebtedness on the part of Clark to Safeguard, had weakened Safeguard's financial base.[36] At or near the time of the Debenture's issuance, there was no quid pro quo release of funds or other assets by Safeguard to Clark. Regardless of the motivation for its issuance, the Debenture should have been perceived as a gift, a unilateral creation of an indebtedness by Clark.

The respective concepts of gift and investment are mutually exclusive. While a gift demands of its recipient no affirmative action beyond acceptance, an investment is an exchange requiring the investor to "put out money or other assets"[37] for the purposes of income and profit. The investment provisions of the insurance law thus contemplate the surrender of one or more of a company's preexisting assets before the regulatory elements of the provisions become operative. Safeguard surrendered none of its assets to acquire the Clark Debenture. Therefore, the investment provisions were not applicable to said acquisition and could not be deemed to have affected the status of the Debenture as an admitted asset.

Had the applicability of the investment provisions been affirmed, the same result would have obtained. The

------

36. These "transactions" were a $190,000 loss suffered by Safeguard when stock held by the company proved worthless, and a pre-1967 gift of $150,000 by Safeguard to Clark.

37. 48 C.J.S. at 760; Webster's Third New International Dictionary (15th ed. 1966).

second presumption inherent in the Department's initial basis for nonadmissibility was no less presumptuous than the first. In 1970, at the time of its acquisition of the Clark Debenture, Safeguard issued only nonassessable policies. As a nonassessable company, Safeguard could have properly invested in accordance with the surplus investment provisions, section 518 and 603, as well as in accordance with the capital investment provisions of sections 517 and 602.[38] While, as previously noted, sections 517 and 602 exclude evidences of debt issued by nongovernmental entities from their lists of permissible investments, sections 518 and 603 sanction such investments where the issuer was a solvent corporation on the date of investment.[39] Thus, and although not essential to our determination, when tested under the appropriate investment provisions, the Clark Debenture clearly assumed the status of an admitted asset.[40]

In ascertaining the proper method of valuation to be applied to a particular evidence of debt held by an insurance company, section 405a must first be perused. That section, in pertinent part, provides:

> "All bonds or other evidences of debt held by any ... mutual insurance company ... shall, if amply secured and if not in default as to principal or interest, be valued: ...." (Emphasis added.)

There follow several methods of valuation, the appropriateness of each being dependent upon the relationship between the purchase price of the debt instrument and its par value. Unlike that of the investment provisions, the

---

38. For a more comprehensive explanation, refer to the discussion under section V, Common Stock, *supra*.

39. Absent proof to the contrary, Clark must be presumed to have been solvent on the date of the Debenture's issuance.

40. The admitted status remains unaffected by a subsequent change in the nature of the company from nonassessable to assessable. *See* discussion under section V, Common Stock, *supra*.

scope of section 405a extends beyond the acquisition date of the instrument, and its utility may be evoked whenever the valuation of bonds or other debt instruments becomes focalized. That is, at any point in time, a failure of either or both of the conditions precedent, "amply secured" and "not in default," will necessitate a revaluation of the debt instrument.

The Department's second basis for not admitting the Clark Debenture was premised upon the absence of "ample security" on June 30, 1973.[41] Even assuming the validity of that premise, the conclusion of nonadmissibility derived therefrom produced a syllogism founded in nondeductive reasoning. Section 405a is a valuation provision. That it was not intended as an arbiter of the admitted/nonadmitted dichotomy is evidenced by the legislature's insertion of a "colon" following "shall . . . be valued." If the satisfaction or failure of the two conditions precedent were to determine *whether* a debt instrument was to be valued rather than *how* a debt instrument was to be valued, the insertion of a "period," in lieu of the "colon," would have been the appropriate means to communicate such intent. The legislature's choice of punctuation mandates, upon a failure of either or both of the conditions precedent, that the sole result be the nonapplicability of the methods of valuation prescribed by section 405a to the particular debt instrument. Such a failure does not thereby establish the instrument as a nonadmitted asset. It merely requires the appraiser of the instrument to proceed beyond section 405a, and base his valuation on factors apart from, and/or in addition to, the purchase price of the instrument.

Further evidence that section 405a was not intended to effectuate the harsh result advocated by the Department appears from the limited applicability of that pro-

---

41. Both parties agreed that the Debenture was not in default on that date.

vision. Since each method of valuation contained in section 405a is based upon the purchase price of the debt instrument, section 405a completely ignors the valuation of debt instruments acquired by gift, whether they are amply secured or otherwise. All factors being equal, a donated debt instrument is no less valuable than a purchased debt instrument. Therefore, the omission from section 405a, of a method specifically oriented towards the valuation of donated debt instruments, should not be interpreted as an expression of a legislative intent that such debt instruments be treated as nonadmitted assets. At most, this omission reflects the inherent character of section 405a as that of a valuation provision with limited application. Unless a debt instrument was originally acquired by purchase and, at the time of valuation, is amply secured and not in default, section 405a cannot be employed as a measure of its worth.

Absent a specific statutory provision, the valuation of donated debt instruments must depend upon the application of general valuation principles. Upon such an application, factors such as ample security and default in repayment must, of necessity, assume a relevancy, albeit a relevancy quite distinct from their postures as conditions precedent within the context of section 405a. As a general principle, where a debt instrument is without ample security and/or is in default, the propriety of reporting that instrument at its face value is questionable at best.

The Department's evidentiary presentation alleged the absence, on June 30, 1973, of ample security for the Clark Debenture. This allegation arose by way of oral testimony that Clark was insolvent on that date, a situation which, if proved, would have reduced the then present worth of the Debenture. However, and for three distinct reasons, this Court cannot conclude that Safeguard's reporting of the Debenture, at its face value, was incorrect:

1. Mere oral testimony that a company's liabilities exceed its assets by $400,000 is insufficient evidence of insolvency. The complex nature of *this* case, where Safeguard's financial condition is at issue, clearly reflects the weighty burden imposed upon one who attempts to prove the insolvency of another. This burden is not lightened when collateral issues of insolvency arise.

2. The Department's allegation of Clark's insolvency was based upon at least one false premise. On June 30, 1973, Clark was the owner of certain certificates (debt instruments) issued it by Safeguard pursuant to section 809 of the Insurance Company Law, 40 P. S. §919. Section 809 provides for the advancement of funds to mutual insurance companies, which advances are evidenced by the issuance of "809 certificates" to the donor(s). On June 30, 1973, the "809 certificates" which had been received by Clark for funds advanced to Safeguard had a face value of $623,116.49. However, in ascertaining Clark's financial condition on that date, the Department allowed no value for the certificates. In so doing, the Department relied upon the restrictions which section 809 places upon insurance companies who have received funds and issued such certificates. The certificates "shall not be a liability or claim against the company or any of its assets, and shall be repaid only out of the surplus earnings of such company."[42] Further, section 809 requires the insurance company to notify the Insurance Commissioner prior to making repayment under the certificates. The latter, in effect, vests, in the Commissioner, a veto power over those repayments he or she deems inappropriate. While these restrictions may effectively and substantially reduce the worth of the certificates as between the original parties, they, in no way, render the certificates valueless, particularly in view of their (the certificates') saleability to third parties.

42. 40 P. S. §919.

Neither the statutory law nor the Department's regulations place any impediments upon the alienation of the certificates. In fact, 31 Pa. Code §105.15 requires only that, upon the sale, assignment, etc. of the certificates, the issuing company notify the Department. Since this notification need not be given until after the event, the Department has no veto power over a sale by the holder of the certificates.

Absent any proof to the contrary, this Court must assume that the "809 certificates" held by Clark, on June 30, 1973, were marketable, and at a value equal to their face value. Therefore, in finding Clark insolvent on June 30, 1973, the Department erroneously omitted from its consideration assets having a value of about $600,000, an amount well in excess of Clark's alleged negative surplus.

3. Lastly, the Department made no attempt to establish a correlation between Clark's alleged insolvency and the value of the Clark Debenture. Absolute proof of Clark's insolvency would not necessarily have rendered the Debenture totally worthless, and, yet, the Department assumed the opposite. This "all or nothing" philosophy has permeated this entire litigation, and it reflects a simplistic and unsatisfactory approach to a legal issue rife with "gray areas."

Finally, the Department cited, as support for not admitting the Debenture, Safeguard's refusal to submit the Debenture, for valuation, to the NAIC. There exists no authority for this requirement, and Safeguard's noncompliance must be deemed irrelevant.

To summarize, the Clark Debenture was not acquired as an investment, but rather as a donated debt instrument. Thus, its status as an admitted asset was not subject to the investment provisions of the insurance law. Section 405a prescribes certain methods of valuation applicable to *purchased* debt instruments which are amply secured and not in default at the time of valuation.

All other debt instruments, including donated ones, must be valued according to general principles of valuation. Pursuant to these general principles, the Department was unable to prove the existence of any factors which would have tended to reduce the reported worth of the Clark Debenture. Safeguard's failure to submit the Clark Debenture for valuation by the NAIC was irrelevant in determining the admissibility and/or valuation of the Debenture.

Therefore, in our determination of whether Safeguard was insolvent and/or in hazardous condition on June 30, 1973, Safeguard will be considered as having had, as an asset, the Clark Debenture, at a value of $220,347.79, the full value reported.[43]

X. ACCOUNT RECEIVABLE—CLARK

On its June 30, 1973, quarterly, Safeguard reported, as a part of its "Agents' Balances or Uncollected Premiums" asset account, $105,846.23, which actually represented an account receivable due from Clark, related to the sharing of expenses under the companies' dual occupancy of 1321 Arch Street. The Department correctly characterized this mingling of accounts as an improper accounting procedure; further, the Department refused to allow the account receivable as an admitted asset.

Once again, the Department cited Clark's alleged insolvency as the basis for nonadmittance. Our same responses which denied the effectiveness of this allegation under our discussion of the Clark Debenture have equal relevance here.[44] Any additional comment would be unnecessary and redundant.

Therefore, in our determination of whether Safeguard was insolvent and/or in hazardous condition on June 30,

---

43. This made the value of all of Safeguard's bond holdings $1,401,027.22 on June 30, 1973.

44. Section IX of this opinion, *supra*.

1973, Safeguard will be considered as having had, as an asset, an account receivable due from Clark in the amount of $105,846.23, the full value reported.

## XI. COST OF SUSTAINING LICENSE

Safeguard had been previously suspended from doing business in 1967. In September of 1969, this suspension order was vacated, and Safeguard was permitted to resume the conduct of its affairs.[45] Thereafter, Safeguard began to maintain, as an asset, an account the company has referred to as its "Estimated Charge for Cost of Sustaining License and Business During Suspension Period." Concurrently, Safeguard instituted a policy of refusing to pay any premium taxes due the Commonwealth, and, instead, applying those amounts of taxes due in reduction of the original value of the "Cost of Sustaining License."[46] From an initial value of $749,354.00 (beginning in 1970), the "Cost of Sustaining License" had been reduced to $638,765.05 as of June 30, 1973, at which value it was then reported. This reduction represented $110,588.95 in premium taxes due and accrued as of that date. The Department assumed the position that the "Cost of Sustaining License" was, in fact, worthless, and that the full amount of the unpaid premium taxes was a liability of Safeguard's on June 30, 1973.

Safeguard has offered two theories in support of this extraordinary procedure, the first of which had its basis in an alleged cause of action against the Commonwealth, which cause of action arose from the 1967 suspension. Under this Court's proposed definition of "insolvency," *supra*, assets are to be judged at "a fair valuation" in determining whether or not they exceed liabilities. "A

---

45. *Com. ex rel. Maxwell v. Safeguard Mutual Insurance Co.*, 91 Dauph. 305 (1969).

46. In this way, the company felt it could effectively "collect" the value of the "Cost of Sustaining License" from the Commonwealth, whether the latter agreed or not.

fair valuation" has been defined by the federal judiciary as "a fair market price that can be available for payment of debts within a reasonable period of time."[47] The *Bichel* court was presented with a problem not dissimilar from that posed by the "Cost of Sustaining License." In *Bichel*, the alleged insolvent attempted to persuade the court that an unprosecuted, civil antitrust claim should have been considered an asset for insolvency purposes. Given the uncertainties inherent in valuing such a claim, and the normal period of time (approximately three years) required to prosecute an antitrust action and obtain a recovery thereon, the court held that the claim could not be regarded as "available for the payment of debts within a reasonable period of time." Safeguard's alleged cause of action appears even more tenuous than the *Bichel* antitrust claim and, therefore, cannot serve as authority for reporting the "Cost of Sustaining License" as an asset.

Safeguard's second theory portrayed the "Cost of Sustaining License" as representing extraordinary expenses paid out by the company, during the tenure of its previous suspension, to enable it to retain its license and charter. In *Feldman v. Capital Piece Die Works, Inc.*, 185 F. Supp. 426 (S.D.N.Y. 1960), one of the matters sub judice was whether corporate organization expenses could be considered an asset in a federal insolvency proceeding. While the *Feldman* court did not question the propriety, under normal accounting procedures, of reporting organization expenses as an asset, and amortizing them over the duration of the corporation's existence, the court nevertheless disallowed the expenses as an asset for insolvency purposes because of their lack of saleability. Extraordinary expenses necessary to the *maintenance* (as opposed to the *establishment*) of a corporate entity present an analogous situation, and demand an

---

47. *In Re Bichel Laboratories, Inc.*, 299 F. Supp. 545, 547 (D. Minn. 1969).

identical resolution. Such expenses have a nonexistent market value, and cannot be perceived as an asset in the context of an insolvency proceeding.

Therefore, in our determination of whether Safeguard was insolvent and/or in hazardous condition on June 30, 1973, the "Cost of Sustaining License" will not be treated as an asset, and Safeguard will be considered as having had $110,588.95 in premium tax liability.

## XII. MISCELLANEOUS

Among the assets reported on Safeguard's June 30, 1973, quarterly were several which, although not conducive to extensive analysis, do merit discussion.

On June 30, 1973, Safeguard's asset column included $28,424.44 in "interest, dividends and real estate income due and accrued." The Department, in its examination report, reduced this amount, for the reason that all of the funds, but $576.53, had been received by the company as of June 30, 1973. Thus, the greater part of the funds was no longer "due and accrued," and should not have been reported as such. Safeguard offered no evidence in rebuttal of the Department's position and, in fact, suggested that the Department's treatment was correct.

The Department's examination report contained two general comments with regards to Safeguard's financial condition as of June 30, 1973, namely, that Safeguard had understated its assets and overstated its liabilities on its June 30, 1973, quarterly. The amounts in question were $7,573.89 and $13,230.43, respectively. Not unexpectedly, Safeguard displayed complete accord with this aspect of the report.

Therefore, in our determination of whether Safeguard was insolvent and/or in hazardous condition on June 30, 1973, Safeguard will be considered as having had $576.53 in "interest, dividends and real estate income due and accrued," $7,573.89 in additional assets, and $13,230.43 less liabilities.

CONCLUSION

Our remaining function is to apply the definitions of "insolvency" and "hazardous condition" to Safeguard's financial condition, as we have portrayed it, on June 30, 1973.

On that date, Safeguard's assets equaled $2,432,453.83 and its liabilities equaled $870,656.73. The resultant "Surplus as Regards Policyholders" was $1,561,797.10. Safeguard was not "insolvent" on June 30, 1973, because its assets exceeded its liabilities.[48] Nor was Safeguard in a "hazardous condition" on that date. The magnitude of Safeguard's surplus clearly oppugns any allegations of "imminent insolvency." As the insurance laws are written, Safeguard was neither insolvent nor in a hazardous condition on June 30, 1973.

Having concluded that Safeguard was solvent and in a non-hazardous condition on June 30, 1973, we need not consider the legal efficacy of evidence relating to a change in Safeguard's condition subsequent to that date. The Department has failed to carry its initial burden, and our scope of inquiry must therefore end.

Accordingly, we enter the following

FINAL ORDER

NOW, March 31, 1975, the petition of the Commonwealth pursuant to section 502 of the Insurance Department Act for the appointment of a statutory liquidator is hereby denied and rule to show cause issued thereon is discharged. The order of the Insurance Commissioner dated February 22, 1974, suspending Safeguard Mutual

---

48. The Department has argued that, in addition to an excess of assets over liabilities, Safeguard would have needed $112,500 in "unimpaired surplus" to have satisfied the requirements of the insurance law. Neither the statutory components of this position, nor its validity will be discussed in this opinion, since Safeguard's surplus was more than sufficient, even assuming the correctness of the Department's premise.

238

Insurance Company in the operation of its business, and our Order of March 22, 1974, enjoining and restraining it from making any disposition or removal of its property or records, are hereby vacated.