William J. Sheppard, Insurance Commissioner of The Commonwealth of Pennsylvania, Petitioner *v.* Old Heritage Mutual Insurance Company, Respondent.

Argued February 6, 1979, before President Judge Bowman and Judges Crumlish, Jr., Wilkinson, Jr., Rogers, Blatt, DiSalle and Craig. Judges Mencer and MacPhail did not participate.

*Joseph Kenneth Hegedus,* Deputy Attorney General, with him *Norman J. Watkins,* Deputy Attorney General, Chief, Civil Litigation, and *Gerald Gornish,* Attorney General, for petitioner.

*Malcolm H. Waldron, Jr.,* for respondent.

Opinion by President Judge Bowman, September 5, 1979:

This original jurisdiction action[1] was commenced

---

[1] When this action began, this Court's original jurisdiction was conferred by Section 401 of the Appellate Court Jurisdiction Act of

on August 16, 1977, when petitioner, the then Insurance Commissioner of the Commonwealth of Pennsylvania, filed an application for order to show cause which seeks, as its ultimate relief, the liquidation of the business of Old Heritage Mutual Insurance Company (hereinafter Old Heritage or the Company).[2] Old Heritage is an assessable domestic mutual casualty insurance company, organized pursuant to the laws of the Commonwealth, and licensed by the Insurance Commissioner to engage in the business of health and accident insurance.

Pursuant to the requirements of Sections 213, 214 and 216 of The Department Act, 40 P.S. §§51, 52, and 54, the Insurance Department between March 24 and April 25, 1977, conducted an examination and inspection of the affairs of Old Heritage, as of December 31, 1976, to ascertain its financial condition and its ability to fulfill its obligations, whether it was complying with provisions of law, and any other facts relating to its business methods and management. On August 3, 1977, the Department delivered its report of examination to Old Heritage. According to the report, Old Heritage was insolvent, as of December 31, 1976, by $161,386. On August 4, 1977, the Insurance Commissioner, pursuant to Section 502 of The Department Act, 40 P.S. §202, ordered the business of Old Heritage suspended. After hearing, Old Heritage's application

---

1970, Act of July 31, 1970, P.L. 673, *as amended, formerly* 17 P.S. §211.401. The present statement of our original jurisdiction is found in the Judicial Code, 42 Pa. C.S. §761.

2 Petitioner's application for order to show cause invokes Sections 502, 505 and 506 of The Insurance Department Act of 1921 (The Department Act), Act of May 17, 1921, P.L. 789, *as amended, formerly* 40 P.S. §§202, 205, 206. During the pendency of these proceedings, said three sections were repealed by the Act of December 14, 1977, P.L. 280. The present Article V provisions of The Department Act relative to suspension of business and involuntary dissolution are found at 40 P.S. §221.1 *et seq.*

for supersedeas of said suspension order was denied by order of this Court dated October 17, 1977. In that same order, pursuant to Section 505 of The Department Act, 40 P.S. §205, we enjoined and restrained Old Heritage from the transaction of its business and making any disposition or removal of its property or records without the written approval of the Insurance Commissioner.

On November 28, 1977, trial of this matter commenced before the Honorable FRED W. DAVIS, specially appointed as hearing examiner by this Court. After twenty-three days of testimony, trial was concluded on February 22, 1978.

Proposed findings of fact were submitted by the Department and Old Heritage. On October 11, 1978, Judge DAVIS filed the Recommended Findings of Fact of the Hearing Examiner, which we hereby adopt, dismissing the exceptions of both petitioner and respondent thereto.

Petitioner has advanced several grounds for the dissolution of Old Heritage, any one of which, standing alone, could require dissolution: that the Company is insolvent; that the Company is in such condition that its further transaction of business will be hazardous to its policyholders, members or creditors, or to the public; that the Company has wilfully violated the insurance laws of the Commonwealth; and that the Company is controlled by persons who are untrustworthy and who have mismanaged its affairs.[3] Al-

---

[3] Prior to enactment of the Act of December 14, 1977, P.L. 280, *see* note 2, *supra*, the grounds for liquidation were set forth in Section 502 of The Department Act, 40 P.S. §202. Under the present statute, Section 519 of The Department Act, 40 P.S. §221.19, provides that "[a]ny ground on which an order of rehabilitation may be based . . . shall be grounds for liquidation." Section 514, 40 P.S. §221.14, specifies grounds for rehabilitation orders. Subsection (1) thereof states: "The insurer is insolvent, or is in such condition that

though evidence was introduced at trial on each of the grounds, and although the briefs direct arguments to each, because we have concluded that Old Heritage was insolvent as of December 31, 1976, we need not address the other grounds alleged.

Prior to enactment of the Act of December 14, 1977, P.L. 280, there was no statutory definition of insolvency in the Pennsylvania insurance laws. Thus, in *Insurance Department v. Safeguard Mutual Insurance Co.*, 18 Pa. Commonwealth Ct. 195, 336 A.2d 674 (1975), *aff'd as modified*, 478 Pa. 592, 387 A.2d 647 (1978), we were required to arrive at a workable definition of that term before embarking upon an examination of the financial status of the insurance company in question. Our initial task is somewhat easier in this case inasmuch as the legislature has now provided a statutory definition of the term "insolvency."[4] Section 503 of The Department Act, 40 P.S. §221.3 provides, in part:

'Insolvency' means:

. . . .

---

the further transaction of business would be hazardous, financially, to its policyholders, creditors or the public." Subsection (3) pertains to the honesty or trustworthiness of persons having executive authority. Subsection (9) relates to wilfull violation of any insurance law "in a manner which may result or has resulted in substantial harm to the property or business of an insurer or to the interests of its policy or certificate holders, creditors or the public. . . ."

[4] Section 509 of The Department Act, 40 P.S. §221.9 provides:

Every proceeding heretofore commenced under the laws in effect before the enactment of the amendment of this article effective [December 14,] 1977, shall be deemed to have commenced under this article so amended for the proceeding henceforth, except that in the discretion of the Commissioner the proceeding may be continued, in whole or in part, as it would have been continued had this article not been so amended.

(2) For any other insurer [an insurer not issuing only assessable fire insurance policies] the inability to pay its obligations when they are due, or *whose admitted assets do not exceed its liabilities* plus the greater of (i) any capital and surplus required by law for its organization or (ii) its authorized and issued capital stock. For any insurer licensed to do business in the Commonwealth as of the effective date of this act which does not meet this standard, the term 'insolvency' shall mean for a period not to exceed three years from the effective date of this act that it is unable to pay its obligations when they are due or that its admitted assets do not exceed its liabilities plus any required capital contribution ordered by the commissioner under provisions of the insurance law. (Emphasis added.)

The term "admitted assets" is defined in Section 503 through a specification of thirteen categories of assets which "shall be considered to be admitted," and five categories which "shall not be considered admitted assets in any determination of the financial condition of an insurer." Given this statutory scheme and the holding of the Supreme Court in *Insurance Department v. Safeguard Mutual Insurance Co., supra,* 478 Pa. at 600, 387 A.2d at 651, under prior statutory law, we conclude that non-admitted assets, for the purpose of determining the solvency of an insurance company, must be allocated in the first instance a value of zero. In examining those items claimed by Old Heritage as assets, therefore, we must first determine whether the item is admitted or non-admitted. If the item is non-admitted, no valuation of the item is necessary. If the item is an admitted asset, then we must proceed to place a monetary value upon it.

ASSETS

## A. Cash

Section 503 of The Department Act first specified as an admitted asset: "(i) cash in the possession of the insurer, or in transit under its control, and including the true balance of any deposit in a solvent bank or trust company. . . ." There appears to be no dispute between the parties or as found by the hearing examiner, that, as of December 31, 1976, the value of cash as an admitted asset of Old Heritage is $12,597.

## B. Bonds

The Insurance Company Law of 1921 (The Company Law), Act of May 17, 1921, P.L. 682, *as amended,* 40 P.S. §341 *et seq.,* regulates investment of assets by domestic mutual insurance companies. Section 802(1) of The Company Law, 40 P.S. §912(1), applicable to Old Heritage, provides:

(1)  A domestic mutual insurance company other than a mutual life insurance company, that writes assessable policies, shall invest its assets only in accordance with the laws of this Commonwealth relating to the investment of the capital of domestic stock insurance companies authorized to transact the same class or classes of insurance.

Section 602 of The Company Law, 40 P.S. §722, which relates to the investment of capital of domestic stock casualty insurance companies, does not include public utility bonds among the authorized areas of investments. Nor does Section 503 of The Department Act expressly include public utility bonds as an item to be valued as an admitted asset.

As of December 31, 1976, as reflected in its annual statement for 1976, Old Heritage claimed the amount of $146,123 as an asset consisting of bonds. This claimed asset in bonds included four public utility

bonds acquired by the Company in 1976. The public utility bonds were acquired as a contribution to the company's surplus. The circumstances relating to the acquisition of these bonds need not be recounted in great detail here, but it appears that this acquisition was part of a rehabilitation agreement between the Company and the Insurance Department in June, 1976, the purpose of which was to infuse Old Heritage with additional funds in order to avoid involuntary dissolution at that time.[5] The Insurance Department takes the position that, although such acquisition was "permitted" by it with the understanding that the bonds "would be liquidated within a reasonable time to provide additional surplus,"[6] "[n]o waiver or estoppel concerning the relevant statutory investment provisions may be inferred." The Company argues that the actions of the Department in permitting acquisition of the public utility bonds constitute an agreement that Old Heritage "could carry the bonds as an admitted asset provided that they were disposed of in accordance with the agreement."

We believe that sub-clause (xiii) of subsection (3) under the insolvency provision of Section 503 of The Department Act is applicable to the public utility

---

[5] Old Heritage has been suspended from the transaction of business on June 7, 1976, by order of the Insurance Department because the Department's 1975 report of examination indicated a deficit in policyholders' surplus of $219,939. After the rehabilitation agreement was reached on June 17, 1976, suspension of the Company was terminated.

[6] The hearing examiner found that, in October 1976, an agreement was reached that Old Heritage would sell the bonds of two of the utility companies in 1976 and the remaining two bonds by March 21, 1977. The Company took exception to that date, and maintains that it had until the end of 1977 to dispose of the bonds. In any event, the hearing examiner determined that "[b]efore the conclusion of the trial in this matter, all of the utility bonds under dispute had been sold by Old Heritage."

bonds acquired by Old Heritage. Sub-clause (xiii) provides that the following shall constitute admitted assets: "other assets, not inconsistent with the provisions of this section, deemed by the commissioner to be available for the payment of losses and claims, at values to be determined by him." It is inconceivable to us that an asset item expressly permitted as part of the rehabilitation agreement by the Department would not fall within this provision. In the Department's own report of examination, the value of bonds as an asset of Old Heritage, as of December 31, 1976, was listed at $133,468. This figure was calculated by assigning a zero value to the two utility bonds still held by the Company on that date. Given the fact that these two bonds were not disposed of by Old Heritage by March 31, 1977, thus violating the terms of the agreement, *see* note 6, *supra,* we believe the Department acted properly in excluding them from inclusion as of December 31, 1976.

Therefore, under the circumstances present here, the public utility bonds held by Old Heritage in accordance with the rehabilitation agreement constituted admitted assets and the value of bonds, as of December 31, 1976, is $133,468.

C. Collateral Loans

The item of collateral loans listed as an asset by Old Heritage as of December 31, 1976, is unique in this case in the same manner as the item of public utility bonds is unique because the collateral loan mechanics was also one of the components of the rehabilitation agreement of June, 1976. The hearing examiner found that included as a term of the rehabilitation agreement was that Pennsylvania Health Insurance Agency, Inc. (Pa. Health)[7] would give a $125,000 collateral loan

---

[7] Pa. Health is one of several general agents that sold insurance for Old Heritage. All outstanding shares of the stock of Pa. Health

note to Old Heritage, said note to be secured by the stock of Pa. Health and Gibralter Life Insurance Company (Gibralter).[8] An additional term of the rehabilitation agreement was that the capital stock certificates of Pa. Health and of Gibralter would be placed in a safe deposit box of Old Heritage, under Insurance Department control, as collateral for the obligation of Pa. Health. The obligor, or debtor, of the collateral loan transaction was Pa. Health; the creditor, or secured party, was Old Heritage; the principal amount was $125,000; interest was six per cent (6%) of the unpaid balance; and first payment of principal was due in September, 1976.

On its 1976 second quarterly statement, as of June 30, 1976, Old Heritage reports the acquisition of a collateral loan on June 18, 1976, said loan having terms as described above. The Company reported $125,000 as the asset value of this loan. Old Heritage's 1976 annual statement, as of December 31, 1976, similarly reports the acquisition of the collateral loan on June 18, 1976, and ascribes $105,000 as the asset value of the loan at year's end. The records of Pa. Health indicate that $20,000 of principal was paid on the $125,000 collateral loan to Old Heritage from September through December, 1976.

The Department advances alternative arguments with regard to this collateral loan. First, it argues that since collateral loans are not expressly deemed

are owned by members of the Neff family, who also exclusively comprise the board of directors and officers of Pa. Health. The Neff family also has a dominant role in Old Heritage. Herbert L. Neff is president of Old Heritage; Lawrence D. Neff, his son, is vice-president and general counsel; Florence Neff, Hertbert L.'s wife, is secretary and treasurer. Each of these is a member of the board of directors of Old Heritage.

[8] Gibralter is a stock life insurance company, its stock owned entirely by Herbert L. and Lawrence D. Neff. See note 7, supra.

admitted assets or permissible investments by any statutory provision, they must have zero value as an asset. Alternatively, the Department argues that if this Court deems this collateral loan to be an admitted asset, then its maximum value as an asset is not $105,-000 as claimed by the Company, but $95,569, a figure established by both an Insurance Department examiner and an independent securities analyst.[9]

We must reject the Department's first argument for reasons similar to those expressed above as to the public utility bond holdings of Old Heritage. In so doing, we emphasize again the unique posture lent to this case by virtue of the rehabilitation agreement between the Department and the Company in June of 1976. Article V of The Department Act did not, prior to enactment of the Act of December 14, 1977, specify in great detail the procedures to be followed in an attempted rehabilitation of an insurance company. The former Section 502 of The Department Act, *formerly* 40 P.S. §202, clearly gave the Insurance Commissioner power to suspend the business of a company upon certain conditions, and impliedly gave the Commissioner the authority to terminate such suspension. Upon acceptance of the rehabilitation agreement in June, 1976, the suspension of Old Heritage, effected on June 7, 1976, was lifted by the Department. *See* note 5, *supra.* We believe that, under the law at the time, the Department in its exercise of discretion, could properly enter into a rehabilitation agreement involving the holding of asset items not otherwise authorized to be held by statute. We view sub-clauses (xii) and (xiii) of subsection (3) of the insolvency provision of the present Section 503 of The Department Act, .40 P.S. §221.3, as

---

[9] The figure of $95,569 was arrived at because the stock of Pa. Health was deemed to have no value as collateral, and the policyholders' surplus of Gibralter, as of December 31, 1976, was $95,569.

a recognition by the legislature that the Commissioner should continue to possess such discretionary power in admitted asset determinations.

We agree with the Department's alternative argument, however, that the value to be ascribed to this collateral loan, as of December 31, 1976, is not $105,-000 as claimed by the Company, but rather $95,569. *See* note 9, *supra.* The hearing examiner found that, based upon the expert opinion of an independent certified public accountant, the stock of Pa. Health has no value as collateral. The hearing examiner further found that, based upon the expert opinions of the Insurance Department examiner and an independent securities analyst, the maximum market value of the collateral loan note is $95,569. Thus, the value of collateral loans as an admitted asset of Old Heritage, as of December 31, 1976, is $95,569.

D. Agents' Balances and Uncollected Premiums

The dispute between the Department and Old Heritage concerning agents' balances and uncollected premiums is not centered upon whether, generically, these items should be considered admitted assets, because clearly they should. Rather, the dispute as to agents' balances is factual, and that as to uncollected premiums the issue revolves around the method of calculation for purposes of placing a value thereon.

As stated by the hearing examiner, "[t]he asset item called 'agents' balances' is defined to be gross premiums, net of commissions, in the course of collection owed from agents to the insurance company on an account not past due more than ninety days." The asset item commonly referred to as "uncollected premiums" is "gross premiums, net of renewal commissions due agents, billed by the insurance company directly to its policyholders, due from the policyholders, but not yet collected from the policyholders with-

in the due date and grace period provided in the insurance policies.'' Both prior case law (*see e.g. Commonwealth ex rel. Chidsey v. Keystone Mutual Casualty Co.*, 62 Dauph. 366 (1952), *aff'd* 373 Pa. 105, 95 A.2d 664, *cert. den.* 346 U.S. 852 (1953); *Insurance Department v. Safeguard Mutual Insurance Co.*, *supra*) and present statutory law (*see* Section 503 of The Department Act, 40 P.S. §221.3[10]) confirms that agents' balances and uncollected premiums are properly considered admitted assets of an insurance company for the purpose of determining solvency.

In its 1976 annual statement, Old Heritage reported a total of $95,930 as the asset value of agents' balances and uncollected premiums. Of this total, $65,870 was attributable to agents' balances due from the Company's three affiliated corporate general agents: Pa. Health (*see* note 7, *supra*); BAH Associates, Inc. (BAH);[11] and Central Penna. Insurance Agency, Inc. (Central Penna.).[12] The remaining por-

---

[10] The following are included as admitted assets under subsection 3 of the insolvency provision of Section 503: "(iv) the net amount of uncollected and deferred premiums . . . ; (v) premiums in the course of collection, other than for life insurance, not more than three months past due, less commissions payable thereon . . . ; (vi) installment premiums other than life insurance premiums to the extent of the unearned premium reserve carried on the policy to which such premiums apply; (vii) notes and like written obligations not past due, taken for premiums other than life insurance premiums on policies permitted to be issued on such basis, to the extent of the unearned premium reserves carried thereon. . . ."

[11] The board of directors of BAH consists entirely of Herbert L., Florence and Lawrence D. Neff, which individuals, respectively, are the president, secretary and treasurer, and vice-president and assistant secretary of BAH. All outstanding shares of stock of BAH are owned one-third by Lawrence D. Neff, one-third by Florence Neff and one-third by Allan Neff.

[12] The officers and sole stockholders of Central Penna. are Lawrence D. Neff, President, who owns 25% of the outstanding shares; Harris Welsh, Vice-President, who owns 25% of the out-

tion of the total, $30,060, was claimed as uncollected premiums net of commissions.

The Insurance Department in its report of examination non-admitted the entire amount claimed as "agents' balances" because, as found by the hearing examiner, the Department "thought those agencies were not solvent and because . . . [the Department] found these accounts consisted of expenses paid for, advances given to, and return commissions due from Old Heritage's agents."[13] Although we express no view as to the collateral issue of the solvency of the three agencies upon the agents' balances figure claimed, *see Safeguard, supra,* 18 Pa. Commonwealth Ct. at 231, 336 A.2d at 695, we find substantial evidence in the record to support the conclusion that what Old Heritage called "agents' balances" are not an asset item, but are, in fact, operating expenses paid. *See* definition of "allowances to managers and agents" at 31 Pa. Code §1.51. The hearing examiner found that "[a]gents' balances, as reported in statements issued by Old Heritage, consisted of expenses paid by the company on behalf of its agents or sub-agents, or advances given to them, or unearned commissions which were due from them on cancelled policies. They included phone bills, travel expenses and other shared expense." This fact, coupled with the finding that "[t]hese expenses receivable from Old Heritage's general agents have continued to grow without substantial cash settlement since 1972" leads us to conclude that the Department properly non-admitted the claimed amount of "agents' balances."

With regard to the $30,060 figure claimed by the Company as uncollected premiums net of commissions,

standing shares; and Florence Neff, Secretary-Treasurer, who owns 50% of the outstanding shares.

[13] Findings of Fact No. 69.

the hearing examiner found that this amount "represented the uncollected premiums for which Old Heritage had billed its policyholders during the ninety (90) days prior to December 31, 1976." The Department's figure for the asset value of this item is $2,946. This significant discrepancy exists for two reasons: (1) the Department allowed only forty-five (45) days as the length of time for which uncollected premiums may be claimed as an asset; and (2) after determining that Old Heritage actually collects approximately ten per cent (10%) of uncollected premiums reported, the Department used an amount, $3,367, which its examination revealed was actually collected as of December 31, 1976, which amount, net of commission, becomes $2,946.

The Department has offered no statutory authority to support the method utilized by it in calculating uncollected premiums. In light of the plain language of sub-clause (v) of sub-section (3) of the insolvency provision of Section 503 of The Department Act, to wit, that admitted assets shall include "(v) premiums in the course of collection, other than for life insurance, not more than three months past due, less commissions payable thereon," we would be hard pressed indeed to accept either the Department's forty-five day cut-off point or its 10% actual collection calculation. We, therefore, accept the Company's figure of $30,060 as the admitted asset value of the uncollected premium component of agents' balances and uncollected premiums.

E.   Interest Income Due and Accrued

Sub-clause (ii) of subsection (3) of the insolvency provision of Section 503 of The Department Act establishes as admitted assets:

(ii) investments, securities, properties and loans acquired or held in accordance with the

act, and in connection therewith the following items: (A) interest due or accrued on any bond or evidence of indebtedness which is not in default and which is not valued on a basis including accrued interest, ... (C) interest due or accrued upon a collateral loan in an amount not to exceed one year's interest thereon. ...

The hearing examiner found that "[a]s of December 31, 1976, in its 1976 annual statement, Old Heritage claimed the amount of $3,952 as an asset consisting of interest income due and accrued. The $3,952 is the sum of $1,327 in interest [on] bonds, and $2,625 in interest on collateral loans." However, with respect to the collateral loans, the hearing examiner concluded that the interest thereon "was not paid on a current basis during 1976 and any interest paid did not correspond with payments of principal." We shall, therefore, ascribe $1,327 as the admitted asset value of interest due and accrued, this figure being the value of interest on bonds, with no value ascribed to interest on collateral loans.

### LIABILITIES

The insolvency provision of Section 503 of The Department Act does not contain as specific a definition of "liabilities" for purposes of determining solvency as it does of "admitted assets." The statute provides:

For purposes of this article 'liabilities' shall include but not be limited to reserves required by statute or by insurance department general regulations or specific requirements imposed by the commissioner upon a subject company at the time of admission or subsequent thereto, and any other capital and surplus requirements.

Thus, reference must be made to other statutory provisions for liability determinations.

## A. Losses

Section 311 of The Department Act, 40 P.S. §92, requires that Old Heritage establish a liability for losses, commonly known as loss reserve. Said section provides:

> The Insurance Commissioner shall, in calculating the reserve against unpaid losses of casualty insurance companies . . . , set down, *by careful estimate in each case, the loss likely to be incurred against every claim presented or that may be presented* in pursuance of notice from the insured of the occurrence of an event that may result in a loss. The sum of the items so estimated shall be the total amount of the reserve. . . . (Emphasis added.)

As the above-emphasized language clearly indicates, calculation of loss reserve necessarily entails an element of informed prediction, because "careful estimate" must be made as to the likelihood of amount of loss not only as to claims presented but also as to claims "that may be presented" within the prescribed period.

The Department argues that Old Heritage's liability for losses as of December 31, 1976, is $79,378. The Company, in its 1976 annual statement, reported this liability item at $30,365. Our resolution of which figure is correct or more precisely which figure is more accurate, is not simplified by the role which estimation inherently plays in this item. Two factors, however, have convinced us that the figure offered by the Department should be accepted: (1) based on the evidence in this record, the process used by the Department approaches more closely the "careful estimate" required by the statute; and (2) the Company's ability to estimate accurately loss reserves has historically proven to be deficient.

With regard to the process used by the Company to arrive at its figure of $30,365, there is the testimony in the record by Company officers that Old Heritage established its loss reserves on a case-by-case basis. Counsel for Old Heritage argues that this evidence is sufficient to prove the Company "fully complied with the statute" in establishing its loss reserve, and that the Insurance Department's approach requires an insurance company to "look into a crystal ball and ascertain the effect of events about which it has no knowledge at the time of filing its [annual statement]." We disagree.

The process used by the Department examiners was described in detail before the hearing examiner and is set forth in its essentials in the Findings of Fact Nos. 90 and 94. The Department utilized the Company's own computerized print-outs of both reported and incurred but not reported losses as of December 31, 1976. The Department based its calculations on the Company's own figures of amounts authorized for payment. While the Department's figure, derived from its examination in March and April of 1977, could conceivably have been affected by some degree of hindsight, we cannot disregard it on the basis of that possibility alone.

Equally as important in our decision to reject the figure for loss reserve offered by Old Heritage is the patterned inability of the Company accurately to estimate its reserve liability. The hearing examiner found that for losses incurred as of December 31, 1974, the Company reserved $15,115, but, subsequently, actually paid out $73,834 for those same losses. For 1975, the Company reserved $51,043 but it actually paid out $72,675 for those losses. For the year in question here, 1976, Old Heritage eventually paid out $101,081 for the losses for which it had reserved $30,365. The hearing examiner further found that the Company had

been advised on six occasions by the Department between July, 1973 and August, 1977 that its loss reserves "had been deemed inadequate."

Therefore, we accept the Department's figure of $79,378 as the proper amount of loss reserve liability of the Company as of December 31, 1976.

B.  Loss Adjustment Expenses

The liability of loss adjustment expenses reflects the amount of expenses incurred by an insurance company in the processing of claims on unpaid losses. It is a projected figure in the sense that it anticipates the expenses of adjusting unpaid reported and incurred but not reported losses.

As of December 31, 1976, in its 1976 annual statement, Old Heritage claimed the amount of $3,036 as its liability for loss adjustment expenses. This figure is a straight 10% of $30,365 claimed as the Company's liability for losses. *See* discussion of "Losses", *supra*.

Old Heritage's 1976 annual statement, however, reflects not 10%, but approximately 20%, as the ratio of loss adjustment expenses incurred ($49,319) to losses incurred ($239,591). The hearing examiner described the Department's method of computation of loss adjustment expenses as follows: "The Department computes the liability of loss adjustment expenses by deriving a ratio of loss adjustment expenses incurred to losses incurred [20%], and by applying one-half of the ratio to reported losses and the full amount of the ratio to incurred but not reported losses." The record contains evidence which satisfies us that this method is standard insurance industry practice and we believe the Department's utilization of this method was proper.

By application of the above formula, as of December 31, 1976, Old Heritage's liability for loss adjustment expenses is $10,849.

## C. Unearned Premium Reserve

Old Heritage is required to maintain an unearned premium reserve as a liability.[14] *See* Section 310 of The Department Act, 40 P.S. §91, and Section 807 of The Company Law, 40 P.S. §917.[15] Old Heritage on its 1976 annual statement, reported its unearned premium reserve at $279,576. The Department examiners determined that the reserve should be $254,435, the reduction solely attributable to the fact that the Department did not accept the Company's method of reporting uncollected premiums. However, since we have accepted the Company's position on this issue, *see* discussion of "Agents' Balances and Uncollected Premiums," *supra,* we shall ascribe $279,576 as the value of Old Heritage's unearned premium reserve liability.

## D. Other Expenses

The liability item denominated "other expenses" consists, in this case, of general expenses due or accrued and commissions payable on premiums col-

---

[14] For a discussion of the concept of unearned premium reserve, *see Safeguard, supra,* 18 Pa. Commonwealth Ct. at 204, 336 A.2d at 681-82.

[15] Old Heritage contends that, although it is mandated by these statutory provisions to "maintain a reserve for unearned premiums," the following language of Section 808 of The Company Law, 40 P.S. §918, means that the reserve "is not considered as a liability except to the extent that there is surplus in excess of all other liabilities . . .": "Any domestic company which shall be deficient in providing the unearned premium reserves required hereby may, notwithstanding such deficiency, come under this act on the condition that it shall each year thereafter reduce such deficiency at least fifteen per centum (15%) of the original amount thereof. . . ." We reject this contention. The first sentence of Section 808, not cited by Old Heritage, refers to "the unearned premium reserve and *other liabilities.* . . ." (emphasis added). We interpret this language to mean that the legislature considered the unearned premium reserve unqualifiedly to be a liability. Also, there is no evidence that Old Heritage is deficient in its unearned premium reserve.

lected. The Company, in its 1976 annual statement, reported the figure of $8,945 as the amount of this liability. During trial, however, Old Heritage offered no testimony or other evidence to support its figure.

The Department maintains that the correct amount for this liability, as of December 31, 1976, is $21,488. The Department arrived at this figure on the basis of its examiners' inspection of the Company's commission payments and paid invoice files. Given this state of the record, we accept the Department's figure and establish $21,488 as the liability of Old Heritage for other expenses.

E.   Taxes, Licenses and Fees

The Company and the Department agree, and the hearing examiner found, that, as of December 31, 1976, Old Heritage's liability for taxes, licenses and fees is $38,265.

F.   Amounts Withheld for Accounts of Others

With regard to this liability, no dispute has arisen, and we therefore find the Company's liability to be as claimed by it on its 1976 annual statement, $2,533.

SUMMARY OF INSOLVENCY

Arrangement of our above findings into balance sheet format produces the following financial picture of Old Heritage as of December 31, 1976 =

*Admitted Assets*

| | |
|---|---|
| Cash | $ 12,597 |
| Bonds | 133,468 |
| Collateral Loans | 95,569 |
| Agents' Balances and Uncollected Premiums | 30,060 |
| Interest Income Due and Accrued | 1,327 |
| *Total* | $273,021 |

*Liabilities*

| | |
|---|---|
| Loss Reserve | $ 79,378 |
| Loss Adjustment Expenses | 10,849 |
| Unearned Premium Reserve | 279,576 |
| Other Expenses | 21,488 |
| Taxes, Licenses and Fees | 38,265 |
| Amounts Withheld for Accounts of Others | 2,533 |
| | |
| *Total* | $432,089 |
| *Policyholders' Surplus* | ($159,068) |

Because the admitted assets of Old Heritage, as of December 31, 1976, do not exceed its liabilities, we conclude that the Company is insolvent as of that date.

### REHABILITATION

There remains the issue of whether, despite its insolvency as of December 31, 1976, Old Heritage should be rehabilitated. Put another way, has the Company successfully carried its burden of proving "a subsequent change in its condition, which change resurrected the company"? *Safeguard, supra,* 18 Pa. Commonwealth Ct. at 202, 336 A.2d at 680. We are of the opinion that the Company has not carried that burden.

First, the Company argues that its 1977 annual statement reveals that, as of December 31, 1977, the Company was solvent. Not surprisingly, the Department's position is that as of that date, Old Heritage was still insolvent. Although it should be apparent that we are not about to subject Old Heritage's 1977 annual statement to the same degree of scrutiny given to its 1976 annual statement, we note that several items claimed by the Company as admitted assets as of December 31, 1977, specifically agents' balances and the two public utility bonds held beyond the agreed upon disposition date, we have already disallowed for 1976. We further note that as to the value of collateral

loans claimed by Old Heritage as of December 31, 1977, the record reveals that during 1977 the Company's collateral loan transactions become increasingly difficult to trace. Finally, we note that as to the unearned commissions claimed by the Company as an asset in 1977,[16] Section 503 of The Department Act does not expressly include this item as an admitted asset for purposes of determining solvency.[17]

Moreover, we are in agreement with the Department's position that the prospects for rehabilitation of Old Heritage should be judged in light of prior rehabilitation efforts. The insolvency of Old Heritage for the year 1976 is not an aberration blemishing an otherwise healthy financial picture. The Department's 1975 report of examination revealed insolvency for that year also and was the basis for the Company's suspension in June 1976. *See* note 5, *supra*. Old Heritage subsequently amended its 1975 annual statement to conform to the Department's report of examination. We are cognizant, too, of the fact that the rehabilitation agreement between the Company and the Department in June of 1976, while improving Old Heritage's financial position, proved incapable of producing the solvency sought.

For all of these reasons, we believe the Company has not established that it should be rehabilitated.

## Conclusion

1. Old Heritage Mutual Insurance Company as of December 31, 1976, was insolvent and the action of the

---

[16] Old Heritage did not claim unearned commissions as an asset in its 1976 annual statement.

[17] The possibility of unearned commissions operating as a "contra liability" was discussed in dictum by this Court in *Safeguard*, *supra*, 18 Pa. Commonwealth Ct. at 209-11, 336 A.2d at 684-85; of course, our decision in *Safeguard* predated by nearly three years the Act of December 14, 1977, P.L. 280, which enacted the present Section 503 of The Department Act.

Insurance Commissioner of Pennsylvania in seeking its liquidation for this reason, among others, shall be granted.

2. Old Heritage Mutual Insurance Company, as an alternative to liquidation, should not be permitted to rehabilitate itself.

3. The additional relief sought by the Insurance Commissioner of Pennsylvania that we now direct Old Heritage Mutual Insurance Company be dissolved as a corporate entity is denied as premature but without prejudice.

FINAL ORDER

Now, September 5, 1979, petitioner's application to liquidate the business of respondent Old Heritage Mutual Insurance Company is hereby granted. The Insurance Commissioner of the Commonwealth of Pennsylvania is hereby appointed liquidator of said company and in that capacity is directed forthwith to take possession of the assets of said company, in accordance with Section 520 of The Insurance Department Act of 1921, 40 P.S. §221.20.

Petitioner's application to have this court order dissolution of respondent company as a corporate entity is denied without prejudice to renew the same at some future time incident to the liquidation of respondent or to effect dissolution by operation of law upon the discharge of petitioner as liquidator as provided by Section 522 of this Act, 40 P.S. §221.22.