**SIERRA LIFE INSURANCE COMPANY, an Idaho Corporation, Plaintiff and Appellant,**

v.

**J. O. WIGEN, Commissioner of Insurance and State of North Dakota, Defendant and Appellee.**

Civ. No. 9606.

Supreme Court of North Dakota.

Nov. 30, 1979.

that a jury trial is required simply because a legal defense has been designated as a legal counterclaim.

William S. Murray, Bismarck, and A. Bob Jordan (argued), Oklahoma City, Okl., for plaintiff and appellant.

Lundberg, Conmy, Nodland, Rosenberg, Lucas & Schulz, Bismarck, and Allen I. Olson, Atty. Gen., Bismarck, for Byron Knutson, the current insurance commissioner, appropriately the defendant and appellee under Rule 25(d)(1), N.D.R.Civ.P., see also Rule 3(d), N.D.R.App.P.; argued by Irvin B. Nodland, as Sp. Asst. Atty. Gen.

Thomas O. Smith, Sp. Asst. Atty. Gen., Insurance Commission, Bismarck, for North Dakota Ins. Dept., J. O. Wigen, former Commissioner of Insurance, at the administrative hearing.

ERICKSTAD, Chief Justice.

This is an appeal by Sierra Life Insurance Company from a judgment of the Burleigh County District Court, entered November 16, 1978, in which judgment the court affirmed the order of the North Dakota Commissioner of Insurance suspending Sierra's Certificate of Authority to do business in North Dakota "until such time as [Sierra] complies with the applicable provisions of North Dakota law which it was found to be in violation thereof; and it divests itself of those assets which were found to be assets which were not secure, well invested and in the best interest of its policyholders."

Sierra, an insurance company incorporated in Idaho, was first authorized in 1963 to transact insurance business in North Dakota, and it continued to do so until its Certificate of Authority was suspended by the North Dakota Insurance Commissioner on October 21, 1976.

During 1973 an examination of the affairs and financial condition of Sierra was jointly conducted by the insurance departments of North Dakota and Idaho. This examination culminated with a report stating that Sierra held certain assets in violation of the Idaho Insurance Code and that such assets should be nonadmitted (i. e. treated by the insurance commissioner as having no value). Sierra filed a protest with the Idaho Insurance Commissioner, and the matter was settled on August 17, 1973 by entry of a Stipulation and Order signed by Fred Frazier, President of Sierra, and Robert Hay, the Idaho Insurance Commissioner. By this Stipulation and Order Sierra agreed to dispose of certain assets in exchange for assets meeting the requirements of the Idaho Code and acceptable to the Idaho Commissioner of Insurance.

During May of 1976 Lloyd B. Schoeder, Chief Examiner of the North Dakota Insurance Department, filed a complaint with the North Dakota Insurance Commissioner alleging that Sierra was holding certain assets in violation of the North Dakota insurance laws and requesting the commissioner to suspend Sierra's Certificate of Authority. A three-day hearing was commenced on June 28, 1976 at which both the North Dakota Insurance Commissioner and Sierra were represented by legal counsel. The determination of Sierra's financial condition was based on its status as of December 31, 1975, together with consideration of changes occurring subsequent to that date and prior to the June 1976 hearing having a possible effect on Sierra's financial condition. The hearing examiner issued his Findings of Fact, Conclusions of Law and Order on October 19, 1976, wherein he concluded certain assets owned by Sierra were not secure or well invested and were not the type of assets in which the North Dakota insurance laws permit a life insurance company to invest its funds. The hearing examiner nonadmitted such assets and, as a result, concluded that Sierra was financially in an "unsound condition." The hearing examiner ordered that Sierra's Certificate of Authority be suspended until Sierra complied with the provisions of the North Dakota law which it was found to have violated and it divested itself of the questionable assets. On October 21, 1976, the North Dakota Commissioner of Insurance affirmed the decision of the hearing examiner.

Sierra appealed to the Burleigh County District Court, and that court affirmed the order of the North Dakota Insurance Commissioner. Sierra now appeals to this Court from the judgment of the District Court. We affirm.

Sierra first asserts on appeal that the North Dakota Insurance Commissioner is barred from questioning those assets which were allegedly acquired by Sierra under the terms of the August 17, 1973 Stipulation and Order. Sierra bases this assertion on three theories: res judicata; collateral estoppel; and "common law" estoppel.

■ The Stipulation and Order was entered as a settlement to proceedings in Idaho and was signed only by the president of Sierra and the Idaho Insurance Commissioner. We conclude, therefore, that the doctrines of res judicata and collateral estoppel do not apply because the North Dakota Insurance Commissioner was neither a party to the Stipulation and Order nor was he in privity with any party to such agreement. *See, Sturdevant v. SAE Warehouse Inc.,* 270 N.W.2d 794 (N.D.1978).

■ Sierra also asserts that the North Dakota Insurance Commissioner is estopped from questioning such assets because he orally agreed with the Idaho Insurance Commissioner to be bound by the terms of the Stipulation and Order. To support this assertion Sierra directs us to the following language in a letter written by the North Dakota Insurance Commissioner to the president of Sierra on October 14, 1974, more than one year after the Stipulation and Order was entered,

"In August of 1973, we received a copy of the Stipulation and Order Docket 121 which was drawn up by yourself and then Commissioner Hay. We also had a telephone conversation with the Idaho Department and we agreed to go along with the agreement as stipulated."

In a subsequent paragraph of that letter the North Dakota Commissioner explains the extent of his oral agreement with the Idaho Commissioner,

"Frankly, Mr. Frazier, we thought we were quite benevolent and were in fact doing a favor to Sierra Life by agreeing with the proposed informal rehabilitation. In discussions with the Idaho Department, we had agreed that we would not take any drastic steps even to the point of directing Sierra not to write any new business. If you would prefer that we change our present method of regulating your business in North Dakota, we are reasonably certain that we have statutory authority to do so."

Regarding this issue, the North Dakota Commissioner testified, in relevant part, as follows:

Q. (Mr. Jordan continuing) "Anyway, Commissioner, you agreed with the Idaho Commissioner's Stipulation and decision at that time; is that correct?

A. At that time, yes, I agreed to go along with it."

\* \* \* \* \* \*

Q. "You already testified that you agreed to go along with the stipulation and order. Do you not think that Sierra complied fully with it? Do you have any evidence that you can give right now that Sierra did not comply fully with the letter of that stipulation and order as well as the spirit of it?

A. I cannot talk for the Commissioner in Idaho. As far as my verbal agreement with him to go along, I agreed that I would hold everything in abeyance until such time as the matters were fairly well cleared up."

Based on the foregoing evidence it is unreasonable for Sierra to conclude that the North Dakota Commissioner agreed to prohibit his office or the State of North Dakota from future examinations of Sierra's assets and financial condition to ascertain its compliance with the North Dakota insurance laws. We conclude that the North Dakota Commissioner did not agree to be bound by the Stipulation and Order to accept, thereafter, without question, the assets of Sierra allegedly acquired under the terms of the Stipulation and Order. The North Dakota Commissioner only agreed to refrain from taking any immediate action against Sierra while it was attempting to resolve matters with the Idaho Commissioner under the Stipulation and Order agreement. The commissioner complied with such agreement not to take immediate action, and there is no basis upon which to predicate an estoppel of the commissioner's 1976 proceedings against Sierra.

Pursuant to Section 26–01–16, N.D.C.C., the decisions of the insurance commissioner are subject to review by appeal under the Administrative Practices Act, Chapter 28–32, N.D.C.C. Our review under the Administrative Practices Act is of the findings of Fact, Conclusions of Law, and Decisions of the Administrative Agency, and an agency decision will be affirmed unless, pursuant to Section 28–32–19, N.D.C.C., any of the following are present:

1. "The decision or determination is not in accordance with the law.

2. The decision is in violation of the constitutional rights of the appellant.

3. Provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions and decision of the agency are not supported by its findings of fact."

The issues raised by Sierra on appeal can be best summarized by the following two statements of issue:

(1) Whether or not the commissioner erroneously interpreted and applied various provisions of the North Dakota insurance laws in reaching his decision to suspend Sierra's Certificate of Authority; and

(2) Whether or not the findings of fact which resulted in the commissioner's nonadmission of certain assets held by Sierra were supported by a preponderance of the evidence.

Sierra asserts that as to a foreign insurance company (i. e. a company incorporated in a state other than North Dakota) the determinations of the type of assets it can hold and of the values placed on its assets are to be made by the state of incorporation. Sierra further asserts that, under the North Dakota insurance laws, the North Dakota Insurance Commissioner must accept those determinations as made by the foreign company's state of incorporation and that he has no authority to admit or nonadmit specific assets held by a foreign insurance company or to place valuations on such company's assets contrary to the determinations of the state of incorporation. The North Dakota Insurance Commissioner asserts that his authority to examine a foreign insurance company doing business in this state and to determine whether or not to revoke or suspend that company's Certificate of Authority includes the right to examine specific assets, to place valuations on such assets, and to admit or nonadmit such assets pursuant to the requirements of the North Dakota insurance laws. To resolve this issue concerning the commissioner's authority over a foreign insurance company it is necessary to examine our applicable statutes.

Title 26 of the North Dakota Century Code consists of 31 chapters regulating the area of insurance. The chapters of insurance legislation relevant to this appeal are Chapter 26–07, N.D.C.C., entitled *General Provisions Applicable to All Insurance Companies*; Chapter 26–08, N.D.C.C., entitled *Domestic Insurance Companies*; and Chapter 26–09, N.D.C.C., entitled *Foreign Companies.*

Section 26–07–10, N.D.C.C., gives the insurance commissioner of this state broad authority to inquire into the matters of insurance companies, both domestic and foreign. It reads:

"26–07–10. Inquiry into condition of companies.—The commissioner of insurance may address to any insurance company doing or applying for permission to do business in this state any inquiries in relation to its doings or condition or any other matter connected with its transactions. Any such company so addressed shall reply to any such inquiries promptly and in writing."

Section 26–07–11, N.D.C.C., provides statutory grounds upon which the commissioner must revoke or suspend an insurance company's Certificate of Authority. Section 26–07–14, N.D.C.C., provides additional grounds upon which the commissioner must revoke or suspend a foreign insurance company's Certificate of Authority. It reads, in relevant part, as follows:

"26–07–14. Additional grounds for revocation of authority of foreign company—Procedure—Effect of revocation.—The commissioner of insurance shall revoke or suspend all certificates of authority granted to a foreign insurance company or to its agents if, upon examination or other evidence, he is of the opinion that:

1. Such company is in an unsound condition.

2. Such company has failed to comply with any provision of the applicable laws of this state.

3. Such company, or any officer or agent thereof, has refused to submit to examination or to perform any other legal obligation."

In his conclusions of law the insurance commissioner determined that, "Sierra is in an unsound condition." Consequently the commissioner suspended Sierra's Certificate of Authority under Subsection 1 of Section 26–07–14, N.D.C.C. The conclusion that Si-

erra is in an "unsound condition" derives from the commissioner's nonadmission of a number of assets held by Sierra for the reason that such assets were not to be held by Sierra under North Dakota insurance law. Those assets nonadmitted by the commissioner were given a zero value in his determination of Sierra's financial condition.

The commissioner's approach of admitting and nonadmitting various assets is not without precedent in the field of insurance regulation. *See, Commonwealth Ins. Dept. v. Safeguard Mut. Ins. Co.*, 18 Pa.Cmwlth. 195, 336 A.2d 674 (1975), *modified* 478 Pa. 592, 387 A.2d 647 (1978); *In re American Investors Assurance Co.*, 521 P.2d 560 (Utah 1974); *In re Hardware Mut. Ins. Co.*, 278 N.C. 670, 180 S.E.2d 840 (1971).

Chapter 26–09, N.D.C.C., entitled *Foreign Companies*, does not indicate the specific investments in which a foreign insurance company may or may not invest its funds. However, Chapter 26–08, N.D.C.C., entitled *Domestic Insurance Companies*, does regulate the specific investments in which domestic companies may or may not invest their funds. The commissioner utilized the specific investment sections of Chapter 26–08, N.D.C.C., as guidelines for determining which assets held by Sierra were admissible and which assets were nonadmissible in determining the soundness of its financial condition. We conclude that the commissioner's approach to examining Sierra's financial condition was proper under North Dakota insurance law.

The legislature has imposed upon the commissioner the duty to revoke or suspend a foreign insurance company's Certificate of Authority if, upon examination, he is of the opinion that the company is in an "unsound condition." If the commissioner is to fulfill this duty and is to protect the policyholders of this state it cannot be an abuse of discretion for the commissioner, in his determination of a foreign insurance company's financial condition, to nonadmit those assets held by the foreign insurance company which are prohibited by our laws as investments of a domestic insurance company. Nor can it be an abuse of discretion for our commissioner to require that foreign insurance companies be in substantial compliance with the investment requirements imposed upon our domestic insurance companies, in his determination of their financial condition. Thus, we conclude that it was an appropriate application of our insurance laws for the commissioner to use the domestic investment provisions as guidelines for determining the soundness of the financial condition of Sierra.

Sierra also asserts that under North Dakota law the insurance commissioner must accept the determinations of a foreign company's state of incorporation as to which assets were admissible and as to the values of its assets. We disagree. Our legislature has demonstrated the capacity to expressly state when the commissioner may or must accept the valuations or investment determinations of a foreign insurance company's state of incorporation.[1] No such language has been used in conjunction with the commissioner's authority to examine the financial condition of a foreign insurance company under Section 26–07–14, N.D.C.C.

1. For example, Section 26–10.1–01, N.D.C.C., provides, in relevant part: . . . In lieu of the valuation of the reserves herein required of any foreign or alien company, he may accept any valuation made, or caused to be made, by the insurance supervisory official of any state or other jurisdiction where such valuation complies with the minimum standards herein provided and provided the official of such state or jurisdiction accepts as sufficient and valid for all legal purposes the certificate of valuation of the commissioner when such certificate states the valuation to have been made in a specified manner according to which the aggregate re-serves would be at least as large as if they had been computed in the manner prescribed by the law of that state or jurisdiction.

Section 26–12–27, N.D.C.C., provides: Investment of funds.—Every fraternal benefit society shall invest its funds only in securities permitted by the laws of this state for the investment of the assets of life insurance companies. Any foreign society permitted or seeking to do business in this state, however, which invests its funds in accordance with the laws of the state in which it is incorporated shall be held to meet the requirements of this chapter relating to the investment of funds.

Sierra asserts that the commissioner erred in his conclusion that Sierra had violated Section 26–05–03, N.D.C.C., by its failure to obtain approval from the commissioner prior to entering a reinsurance treaty. On December 31, 1975, Sierra entered a bulk reinsurance treaty with its wholly owned subsidiary, Sandia Life Insurance Company. No prior information or notice of any kind was given to the North Dakota Insurance Commissioner concerning this reinsurance transaction. The commissioner concluded that Sierra had violated Section 26–05–03, N.D.C.C., which, he determined, required Sierra to submit information to and obtain approval from the insurance commissioner prior to entering the reinsurance agreement. We disagree with the commissioner's interpretation of that Section.

Section 26–05–03, N.D.C.C., reads:

"26–05–03. Reinsurance permitted—Limitations.—Except as is otherwise provided in this section and in section 26–07–15, any insurance company organized or admitted to transact business in this state, including a stock, mutual, fraternal benefit, or county mutual company, may reinsure in any insurance company or insurer licensed in any state of the United States of America or in the District of Columbia any part or all of any risk taken by it. A county mutual insurance company also may reinsure with any other such county mutual insurance company. No reinsurance, however, shall be effected with any company or insurer disapproved therefor by written order of the commissioner of insurance filed in his office. *A domestic company organized to engage in the business of life, accident, or health insurance may not reinsure its risks or any part thereof without complying with the provisions of chapter 26–20.*" (emphasis added)

Chapter 26–20, N.D.C.C., sets forth the procedure by which a company must petition the commissioner for approval to enter a reinsurance agreement. Section 26–05–03, N.D.C.C., by expressly limiting compliance with Chapter 26–20, N.D.C.C., to domestic companies, impliedly exempts foreign companies from the prior approval requirement of Chapter 26–20, N.D.C.C.

Section 26–05–03, N.D.C.C., does, however, prohibit *any* insurance company from reinsuring with a company which the commissioner has disapproved by filing a written order of disapproval in his office. When a foreign insurance company, such as Sierra, reinsures without first ascertaining whether the company with which it is reinsuring is on file in the commissioner's office as a disapproved company it reinsures at its own peril. If the company is on file in the commissioner's office as a disapproved company the reinsurance agreement is in violation of Section 26–05–03, N.D.C.C., and the foreign insurance company is then subject to appropriate sanctions by the commissioner. When a foreign company reinsures without seeking prior approval from the commissioner it also takes the risk that the commissioner may subsequently disapprove of the company with which it has reinsured. We shall not attempt to state here, today, what the consequences of such a disapproval might be. Suffice to say that Sierra's failure to seek prior approval of its reinsurance agreement was not a violation of law and the commissioner erred when he considered such act a violation of law in his determination to suspend Sierra's Certificate of Authority.

Sierra also asserts on appeal that there is not sufficient evidence to support the commissioner's findings of fact whereby he nonadmitted various assets held by Sierra as being impermissible investments of an insurance company under North Dakota law. We shall examine each contested asset item separately and in each case determine whether or not the commissioner's findings of fact were supported by a preponderance of the evidence and whether or not his conclusion to nonadmit the asset was supported by the findings of fact.[2]

---

**2.** *See Allstate Ins. Co. v. Knutson*, 278 N.W.2d 383, (N.D.1979) for a discussion of our review of an agency's determinations under Section 28–32–19, N.D.C.C.

*Bonds*

■ Sierra acquired a number of bonds in exchange for other assets. The commissioner made a finding that Sierra valued these bonds on its 1975 annual statement at an amount $237,500 in excess of their market value on the date of acquisition. The commissioner determined that Section 26–07–04, N.D.C.C., required Sierra to value the bonds at no greater amount than their market value on the date of acquisition, and, consequently, the commissioner nonadmitted $237,500 of Sierra's recorded bond value. Sierra contends on appeal that the valuation provisions of Section 26–07–04, N.D.C.C., apply only to bonds which are "purchased" with money and do not apply to bonds acquired by an exchange of assets. Sierra's interpretation of Section 26–07–04, N.D.C.C., is unpersuasive.

Section 26–07–04, N.D.C.C., provides as follows:

"26–07–04. Valuation of securities held by insurance company.—All bonds or other evidences of debt having a fixed term and rate held by any insurance company authorized to do business in this state, if amply secured and not in default as to principal or interest, may be valued as follows:

1. If purchased at par, at the par value thereof.

2. If purchased above or below par, on the basis of the purchase price adjusted so as to bring the value to par at maturity and so as to yield, in the meantime, the effective rate of interest at which the purchase was made.

The purchase price in no case however shall be taken at a higher figure than the actual market value at the time of purchase, and the commissioner of insurance shall have full discretion in determining the method of calculating values according to the foregoing rule."

The language of this section does use the term "purchased" and "purchase price," but there is authority for the conclusion that the term "purchased" can include acquisition by exchange. *In re Penn Central Securities Litigation*, M.D.L. Docket No. 56, 494 F.2d 528 (3rd Cir. 1974); *Swanson v. American Consumer Industries, Inc.*, 415 F.2d 1326 (7th Cir. 1969); *Stella v. Graham-Paige Motors Corp.*, 132 F.Supp. 100 (S.D.N.Y.1955); *Keeler v. Murphy*, 117 Cal.App. 386, 3 P.2d 950 (1955). The rather obvious purpose of this law is to protect policyholders from the potential adverse consequences of inflated asset valuations by an insurance company. This objective is just as applicable and commendable when the bonds held by an insurance company are acquired by an exchange of assets as when they are acquired by money purchase. Consequently, we interpret the provisions of Section 26–07–04, N.D.C.C., to apply to bonds acquired by an exchange of assets as well as by money purchase.

Sierra has not disputed the commissioner's finding that the bonds in question are valued by Sierra at an amount of $237,500 in excess of their market value at the time of acquisition. We conclude, therefore, that the commissioner did not err when he nonadmitted $237,500 of the bond value in order to correctly reflect the value of Sierra's bonds as required by Section 26–07–04, N.D.C.C.

*Loan Number 255*

■ On its 1975 annual statement Sierra listed as an asset Mortgage Loan Number 255 at a value of $550,000. This loan was secured by eight acres of real property located in Maui County on the island of Molokai, Hawaii. The commissioner determined that this loan asset was not secure or well invested and he nonadmitted the entire $550,000 loan value.

The commissioner's conclusion that the loan was not secure or well invested was based upon his finding that the real property which secured the loan was "unimproved." Subsection 3 of Section 26–08–11, N.D.C.C., provides in relevant part, that a domestic insurance company may invest its funds in "[n]otes secured by mortgages on *improved unencumbered real estate . . .*" (emphasis added). Using this provision as a guideline for determining the permissibility of Sierra's investment, the commissioner determined that Loan Number 255 was imper-

missible because it was secured by unimproved property and, therefore, he nonadmitted it.

Our insurance laws do not define the term "unimproved real estate." In the case of *Commonwealth Ins. Dept. v. Safeguard Mut. Ins. Co.*, 18 Pa.Cmwlth. 195, 336 A.2d 674 (1975), *modified* 478 Pa. 592, 387 A.2d 647 (1978); the Commonwealth Court of Pennsylvania defines the term "unimproved real property" in a context similar to the instant case. We agree with that court's explanation of and rationale for the legislative requirement that insurance companies only be allowed to invest in loans secured by *improved* real property:

"The investments of insurance companies are closely regulated in order to guarantee the availability of funds for the payments of claims submitted by its policyholders. Although an insurance company, like all business, must invest its assets for profit, the law prohibits insurance companies from engaging in essentially speculative investments. In particular, land investment is restricted to loans upon improved real estate. Through this restriction, the legislature attempted to guarantee that, in anticipation of possible default in the repayments of real estate loans, the security would be of sufficient worth to prospectively minimize or eliminate the company's and, ultimately, the policyholders' potential for loss. . . .

"Where the real property provided as security for funds loaned by an insurance company is 'readily marketable' and has an 'ascertainable fair market value,' that real property is 'improved' under both sections 517 and 602. By 'readily marketable' is meant that, in case of default by the mortgagor and foreclosure by the company, the company can anticipate having little or no difficulty in locating a purchaser willing to pay a price sufficient in amount to provide the company with a complete return on its original investment. An 'ascertainable fair market value' exists where, at the time of the investment, the real property given as security has a measurable market value,

about which experts would not unduly disagree. The presence of both factors guarantees as much as possible, that an insurance company will not transact loans secured by property which is located 'in the middle of nowhere,' property whose value as adequate security is contingent upon the occurrence of future events. The absence of either factor, at the time of the loan, will render the real estate 'not improved' and the mortgage a nonadmitted asset." 336 A.2d at 690.

To be improved real property within the context of Subsection 3 of Section 26–08–11, N.D.C.C., that property, at the very least, must be in the process of development with improvements thereon such that it is readily marketable and that it has a present ascertainable market value, exclusive of any value based upon contingent future events.

The commissioner supported his determination that the property securing Loan Number 255 was unimproved with the findings of fact that no buildings were located on the property, that the property was not under cultivation, and that the property was a bare tract of land covered with trees, grass, and shrubs which was presently zoned for agricultural purposes. We have examined the evidence, including the appraisal reports of the real property securing Loan Number 255, and we conclude that there is a preponderance of the evidence to support the foregoing findings of fact made by the commissioner. Furthermore, such findings support the commissioner's conclusion that the property was unimproved. We conclude that the commissioner did not err when he nonadmitted the $550,000 value on Loan Number 255.

*Furniture and Fixtures*

■ The commissioner nonadmitted the entire value of $104,657 listed by Sierra on its 1975 annual statement for furniture and fixtures. The commissioner concluded that furniture and fixtures are "rapidly depreciating assets" and, consequently, that such assets could not be considered secure or well invested. Lloyd B. Schoeder, the Chief Ex-

aminer for the North Dakota Insurance Department, testified that historically the North Dakota Insurance Department has never allowed furniture and fixtures as admitted assets. The commissioner did not, however, have any statute or regulation upon which to base his determination. Nor did the commissioner make a finding that the $104,657 value Sierra placed on its furniture and fixtures was inflated or inaccurate. His sole basis for nonadmission of these assets was that they depreciate rapidly and that historically furniture and fixtures have been nonadmitted in North Dakota. The commissioner has failed to advance any authority which would support his conclusion that these are impermissible assets which should not be included in determining the financial soundness of Sierra. Although this Court is reluctant to substitute its own judgment for that of administrative agencies to whom such matters are entrusted we cannot allow the commissioner to totally nonadmit assets on the sole basis that such assets have been nonadmitted in the past and that such assets are rapidly depreciating. We conclude that the commissioner erred when he nonadmitted these assets, and we shall consider them, at a value of $104,657, in our determination of whether or not the commissioner was authorized to suspend Sierra's Certificate of Authority.

*Sandia Stock*

■ Sierra listed as an asset on its 1975 annual statement 200,000 shares of common stock in its wholly owned subsidiary, Sandia Life Insurance Company, at a market value of $703,619.[3] The commissioner examined the financial condition of Sandia in order to determine whether or not Sierra's common stock in Sandia was a secure and well invested asset which should be admitted in determining the financial soundness of Sierra.

Upon examining Sandia's assets the commissioner concluded that Sandia had over-

valued certain bond assets by $88,000 and that Sandia held a mortgage loan in the amount of $535,000 secured by unimproved real estate which was an impermissible asset. Consequently, the commissioner nonadmitted the $88,000 of the bond value and also nonadmitted the entire $535,000 mortgage loan asset. Upon nonadmitting these assets the commissioner concluded that Sandia's capital was substantially impaired. As a result of the foregoing determinations the commissioner concluded that Sierra's common stock in Sandia was neither secure nor well invested, and the commissioner nonadmitted the entire $589,895 common stock value. We uphold the commissioner's determination to nonadmit the Sandia stock.

Sierra asserts on appeal that the commissioner must accept the book value and net worth of Sandia as determined by the State of New Mexico (Sandia's state of incorporation) and that the commissioner has no authority to make his own examination of Sandia's assets to determine the value and the admissibility of Sierra's common stock in Sandia. We disagree. The commissioner chose to examine the Sandia common stock asset held by Sierra. As part of this process the commissioner examined the asset holdings of Sandia using our insurance statutes as a guideline for determining permissible asset holdings and valuations for Sandia's assets. We agree with Sierra's contention that our commissioner cannot regulate the investments or any other aspect of Sandia because Sandia transacts no business nor does it carry on any other activity in North Dakota. We conclude, however, that our commissioner does have the authority to analyze the financial condition of Sandia for the sole purpose of determining the status of Sierra's common stock asset in Sandia.

Section 26–07–04, N.D.C.C., requires that bonds held by an insurance company shall not be valued at a higher figure than their

---

**3.** It is undisputed that of the $703,619 value on the Sandia common stock asset Sierra entered a corresponding liability of $113,000 on its Mandatory Securities Reserve Valuation Account. Thus, in effect, Sierra carried the Sandia common stock asset at a net book value of $589,895.

actual market value at the time of purchase. There is a preponderance of evidence to support the commissioner's finding of fact that the Sandia bonds were valued $88,000 in excess of their market value. Using Section 26–07–04, N.D.C.C., as a guideline the commissioner properly concluded that Sandia's bonds were overvalued by $88,000.

Sandia's mortgage loan, referred to by the parties as the "Cal Anglin mortgage," is a promissory note, dated April 10, 1975, made by Floyd Cal Anglin and Grace Anglin payable to Sierra, in the amount of $550,000 and secured by real estate located in Riverside County, California. This asset was transferred from Sierra to Sandia on December 31, 1975 as part of their bulk reinsurance treaty agreement. Prior to this transfer the state of Idaho had made a determination that the property securing the note was "unimproved" and that this asset should be nonadmitted. Subsequent to the transfer, our commissioner, upon examining the Cal Anglin mortgage as an asset of Sandia, made a finding that the property securing the note was unimproved. Subsection 3 of Section 26–08–11, N.D.C.C., authorizes domestic insurance companies to invest in "[n]otes secured by mortgages on *improved unencumbered real estate . . .*" (emphasis added). Using this statute as a guideline for determining the permissibility of Sandia's assets the commissioner nonadmitted the Cal Anglin mortgage.

Two items were introduced which provide evidence of the unimproved condition of the real estate securing the Cal Anglin mortgage. In a 1974 report of Sierra prepared by the states of Idaho and Utah the following statement is made with respect to the property securing the Cal Anglin mortgage:

"This unimproved real property represented by raw land, not having permanent improvements thereon, is located in Riverside County, California."

In the September 24, 1975 Findings of Fact, Conclusions of Law, Decision and Order of the presiding officer for the Idaho Director of Insurance the following relevant statements were made regarding the real estate securing the Cal Anglin mortgage:

"The site is presently zoned agricultural with a classification that will allow residential structures on a minimum of five acre tracts . . . There are no improvements suitable for residence, institutional, commercial or industrial use situated on this property, nor are there improvements on the property under construction or in the process of construction suitable for residential, institutional, commercial or industrial use . . . ."

No evidence was offered, contrary to the foregoing evidence, that this real estate was improved property. We conclude that there is a preponderance of evidence to support the commissioner's finding that the real estate securing the Cal Anglin mortgage was unimproved. We further conclude that the commissioner's findings support his determination to nonadmit the Cal Anglin mortgage.

As a result of nonadmitting the Cal Anglin mortgage in the amount of $535,445 [4] and of nonadmitting $88,000 of the bond value held by Sandia the commissioner concluded that the capital and surplus of Sandia was substantially impaired such that the 200,000 shares of Sandia's stock held by Sierra could not be considered an asset which was secure or well invested. Accordingly, the commissioner nonadmitted the common stock of Sandia held by Sierra in the amount of $589,895. In its 1975 annual statement Sandia listed its paid-up capital and surplus in the amount of $703,619. The nonadmission of the Cal Anglin mortgage in the amount of $535,445, and the reduction of the bond value by $88,000 reduces the paid-up capital and surplus of Sandia by the significant amount of $623,445 leaving a net paid-up capital and surplus of only $80,174. As a result, there is a substantial

4. Although the original note from the Anglin's payable to Sierra was in the amount of $550,000 Sandia carried this transferred asset on its books in the amount of $535,445 which explains why the commissioner nonadmitted the Cal Anglin mortgage in the amount of $535,445 and not in the amount of $550,000.

impairment of Sandia's paid-up capital and surplus which substantiates the commissioner's conclusion that Sierra's common stock in Sandia is an asset which is not secure or well invested and that such asset should be nonadmitted in determining the financial condition of Sierra.

Accordingly, we uphold the commissioner's determination to nonadmit the Sandia common stock in the amount of $589,895.

*Excess home office property*

■ On its 1975 annual statement Sierra listed two tracts of property as "home office property that is no longer needed for that purpose," located in Twin Falls County, Idaho. Tract 1 was listed at a book value of $340,720 and tract 2 was listed at a book value of $435,851 for a total book value on the two tracts of $776,571. Prior to the June 1976 hearing Sierra sold both tracts of land to Chisum Homes, a large construction firm headquartered in Las Vegas, Nevada. Fred Frazier, the president of Sierra, testified that Sierra sold the two tracts for a total price of $1,141,000 of which price Sierra received 40 percent in cash (i. e. $456,400) and a purchase money mortgage secured by tracts 1 and 2 for the balance of the purchase price (i. e. $684,600). The commissioner concluded that tract 1 was improved real estate and that the mortgage, as secured by tract 1, was a secure and well invested asset which was admissible in the determination of Sierra's financial condition. However, the commissioner concluded that tract 2 was unimproved real estate and that the mortgage, as secured by tract two, was not a secure or well invested asset and was not admissible in determining Sierra's financial condition. The mortgage [5] received by Sierra from Chisum Homes was not introduced into evidence. Furthermore, there is no evidence in the record, and the commissioner has made no finding, of the value of that part of the mortgage allegedly secured by tract two. On the basis of the evidence before us this Court cannot ascertain what value, if any, should be placed on the mortgage amount secured by tract 2. We conclude that there is not a preponderance of evidence to support the commissioner's determination to nonadmit the mortgage secured by tract 2.

The following simple arithmetic calculation, based on the evidence before us, further demonstrates that no basis exists upon which the commissioner could nonadmit the mortgage secured by tract 2. On its 1975 annual statement Sierra listed tracts 1 and 2 at a book value of $776,571. Sierra received $456,400 cash from the sale of those assets. Subtracting the cash received of $456,400 from the stated book value of $776,571 leaves a remaining stated book value on the 1975 annual statement of $320,171 to reflect the value of the purchase money mortgage Sierra received from Chisum Homes. This purchase money mortgage was secured by tract 1 as well as tract 2. Tract 1, itself, had a book value of $343,720, and the commissioner neither disputed the value placed on tract 1 nor the admissibility of the mortgage asset secured by tract 1. Consequently, the purchase money mortgage received from Chisum Homes and secured by tract 1 was more than adequate, together with the cash received from Chisum Homes, to cover the entire $776,571 book value Sierra had listed on its 1975 annual statement for the excess home office property. We conclude that there was no basis upon which the commissioner was authorized to nonadmit any part of the $776,571 value listed for tracts 1 and 2 on Sierra's 1975 annual statement. Accordingly, we shall consider such asset admissible in our determination of whether or not the commissioner was authorized to suspend Sierra's Certificate of Authority.

*Real estate tract 21*

■ Sierra listed as an asset on its 1975 annual statement real estate tract 21, of approximately 26 acres, located in Knoka, Hawaii County, Hawaii at a book value of $274,964. The commissioner concluded that

---

5. The evidence is unclear whether there was one mortgage secured by both tracts or two mortgages each secured by a separate tract. That determination, however, is not pertinent to ascertaining a proper disposition of this issue.

this was unimproved property being held by Sierra for "speculative purposes" and that such asset was not secure or well invested. He nonadmitted the entire $274,964 value of this asset in his determination of Sierra's financial condition. Sierra asserts that tract 21 was acquired in satisfaction of a debt, and, therefore, pursuant to the insurance laws pertaining to property acquired in satisfaction of debt, it was not necessary that tract 21 be "improved" property or that it be income producing. The commissioner, however, made a finding that tract 21 was acquired in an exchange of assets transaction and not in satisfaction of a debt. Fred Frazier, president of Sierra, testified as follows with respect to the acquisition of tract 21:

Q. "Please explain to the Hearing Officer how Sierra Life acquired that real estate known as tract 21, K–N–O–K–A, Hawaii County, State of Hawaii.

A. "Well, that was taken in on exchange on the stock of Greater Idaho, and it's twenty-six acres; it's in the best location.

\* \* \* \* \* \*

Q. Now this allegation in the Complaint says it was acquired in satisfaction of a debt. I think you testified it was acquired in the Greater Idaho—

A. Well, it was acquired at the time we made the sale of Greater Idaho in satisfaction of a debt along with the overall sale—transaction."

No other evidence was introduced on this issue. The above testimony is not fully enlightening, to say the least; nevertheless, we conclude that the commissioner's finding that tract 21 was acquired in an exchange of assets and not in satisfaction of debt is supported by a preponderance of evidence.

The commissioner used Subsection 13 of Section 26–08–11, N.D.C.C., as a guideline for determining the permissibility of Sierra's investment in tract 21. That subsection provides that domestic insurance companies can invest in "real estate for the production of income or for improvement or development for the production of income

. . ." It does not authorize insurance companies to invest in unimproved real estate for the purpose of allowing such property to lie idle to speculate on possible capital gains which may be achieved through appreciation of the property. The commissioner made findings that tract 21 was unimproved real estate which Sierra was not developing and that Sierra was holding tract 21 for speculative purposes. With regard to those facts Sierra's president testified, on direct examination, as follows:

A. ". . . and this ground has been going up in value so we haven't pursued doing anything with it at this point because it's been increasing in value."

On cross examination Sierra's president further testified as follows:

Q. "You said that you had personally inspected this particular tract?

A. Yes, sir.

Q. Is that correct?

A. Yes, sir.

Q. Are there any buildings located on that particular tract?

A. No, sir.

Q. Is the land under cultivation?

A. It's got banana groves on it, papaya trees—and what's those green things?

Q. Is it under lease for agricultural purposes?

A. No.

Q. Is it overgrown with brush?

A. Yeah. It has been farmed. The guy that has the place next to it looks after it and grazes it and I guess picks the fruit—bananas.

Q. There's no improvements located on this particular tract?

A. Are you talking about a building? There's power lines, phone lines, roads and water and sewer lines on the roads.

\* \* \* \* \* \*

Q. Is there a well located on this particular tract?

A. I don't know whether there is. No, I don't suppose. There could be. I don't know. I never looked it over for a well. There could be a well. Not that I know of.

Q. The only thing that is located near this particular tract are electric lines and telephone lines.

A. And water is going down the road. If you want water, you hook on the water line.

Q. The water line goes down the road, too?

A. Right. Now, I don't know whether you could hook onto it or not."

We conclude that there is a preponderance of evidence to support the commissioner's findings that tract 21 was unimproved and that Sierra was holding tract 21 for speculative purposes and not for improvement or development. We further conclude that the foregoing findings of fact support the commissioner's determinations that such asset was neither secure nor well invested and that such asset should be treated as a nonadmitted asset in determining Sierra's financial condition.

*Dalhar Corporation Loan*

■ Sierra listed as an asset on its 1975 annual statement a collateral loan (which the parties refer to as the Dalhar Corporation Loan) at a value of $413,959.

The background leading to Sierra's acquisition of this loan is informative although not dispositive of this issue. As part of the Stipulation and Order entered between Sierra and the Idaho Insurance Commissioner on August 17, 1973, Sierra agreed to dispose of its Greater Idaho Corporation Stock. Sierra's attorney, A. Bob Jordan, testified that five individuals contracted with Sierra to buy the Greater Idaho Corporation Stock and that subsequent to such transaction the five incorporated their joint venture in Dalhar Corporation. Thereafter, the 44,313,162 shares of Greater Idaho Corporation stock held by Dalhar Corporation were used to secure a collateral loan (i.e. the Dalhar Corporation loan) payable by Dalhar Corporation to Sierra.

During June of 1976, approximately one week prior to the hearing in the instant case, Sierra received payment in full on the Dalhar Corporation Loan. Sierra didn't receive cash, however. In payment of the loan Sierra received the following, according to testimony of Sierra's president, Fred Frazier: 70 acres of property in Twin Falls, Idaho "that joins the campus of the college in southern Idaho", 20 acres of property south of Twin Falls, two apartment houses, and a ⅛ interest in 320 acres of agricultural land. The commissioner concluded that the 70 acre tract of property, the 20 acre tract of property, and the 320 acres of agricultural land were "unimproved" real estate assets not secure or well invested, and he nonadmitted those assets. The commissioner also concluded, however, that the two apartment houses were admissible assets. The commissioner did not make any finding as to the value of the nonadmitted real estate properties or of the two apartment houses. No appraisals were introduced with regard to any of these properties. The only evidence as to the value of these properties was the testimony of Sierra's president, Fred Frazier. He testified that, "these properties are worth a whale of a lot more than the collateral loan" and that he had just sold land for $11,000 an acre which "is not as good a ground" as either of the 70 or 20 acre tracts. Frazier further testified that there was approximately $300,000 owed against the properties received in payment of the Dalhar Corporation Loan, and that ". . . the one piece of property, the 70 acres at $10,000 an acre would be $700,000 which would practically equal what was owed against everything and what was owed us, too." No other evidence was introduced as to the value of these properties. Consequently, there is no basis upon which this Court can ascertain the *dollar amount* which the commissioner could nonadmit assuming, *arguendo*, that the commissioner had sufficient basis to nonadmit the 70 acre tract, the 20 acre

tract, and the ⅛ interest in the agricultural land. We shall consider, therefore, the $413,959 collateral loan asset on Sierra's 1975 annual statement as an admissible asset in our determination of whether the commissioner was authorized to suspend Sierra's Certificate of Authority.

*Loan Number 211*

 Sierra listed as an asset on its 1975 annual statement, at a value of $122,000, Loan Number 211 secured by 80 acres of real estate located in Custer County, Idaho. There was a default on this loan, and Sierra acquired the 80 acre tract in satisfaction of a debt during 1976. The commissioner concluded that this real estate was "unimproved" and, therefore, not secure or well invested, and he nonadmitted the $122,000 value in his determination of Sierra's financial condition. We cannot uphold the commissioner's determination to nonadmit this asset.

Section 26–08–12, N.D.C.C., permits a domestic insurance company to acquire real property in satisfaction of a debt. Section 26–08–13, N.D.C.C., permits a domestic insurance company to retain real property acquired in satisfaction of a debt for at least two years prior to disposing of it. There is no requirement that such real property must be "improved" property in order for the company to retain it for the two year period. Using this section as a guideline for ascertaining the admissibility of Sierra's assets, we conclude that the commissioner had no statutory authority to nonadmit the Custer County real estate held by Sierra on the basis of his finding that this property was "unimproved". Furthermore, the commissioner made no finding that the value of the property was insufficient to cover the $122,000 asset value listed by Sierra on its 1975 annual statement for Loan Number 211. Accordingly, we shall consider the Custer County property asset, at a value of $122,000, in our determination of whether the commissioner was authorized to suspend Sierra's Certificate of Authority.

The foregoing completes our examination and discussion of each asset in issue on this appeal. We can summarize our conclusions with respect to the admissibility of these assets as follows:

| | Asset | Value nonadmitted |
|---|---|---|
| 1. | Bonds | $237,500 |
| 2. | Loan Number 255 | $550,000 |
| 3. | Furniture and Fixtures | commissioner reversed-asset admitted |
| 4. | Sandia Stock | $589,895 |
| 5. | Excess Home Office Property | commissioner reversed-asset admitted |
| 6. | Real Estate Tract 21 | $274,964 |
| 7. | Dalhar Corporation Loan | commissioner reversed-asset admitted |
| 8. | Loan Number 211 | commissioner reversed-asset admitted |

Total nonadmitted asset value $1,652,359

 The balance sheet of Sierra's 1975 annual statement reflects total assets of $11,459,913, total liabilities of $9,740,614, and total paid-up capital and surplus of $1,719,298. Upon deducting those assets of which we have upheld the commissioner's determination to nonadmit in the amount of $1,652,359 Sierra's total paid-up capital and surplus is reduced to $66,359. Section 26–07–14, N.D.C.C., provides that the commissioner shall revoke or suspend a company's Certificate of Authority if, "[s]uch company is in an unsound condition." Although the foregoing analysis does not demonstrate an insolvent condition it does reflect a substantial impairment of Sierra's paid-up capital

and surplus. In our view a company need not be insolvent to be in an "unsound condition" pursuant to Section 26–07–14, N.D. C.C., and we conclude that there is sufficient evidence to support the commissioner's determination that Sierra is in an "unsound condition." Accordingly, we hold that the commissioner was authorized to suspend Sierra's Certificate of Authority pursuant to section 26–07–14, N.D.C.C. Judgment affirmed.

SAND, PEDERSON and PAULSON, JJ., and ILVEDSON, District Judge, concur.

ILVEDSON, District Judge, sitting in place of VANDE WALLE, J., disqualified.